HOLLAND & KNIGHT LLP
Sarah A. Marsey (SBN 297911)
Alex Hadduck (SBN 312962)
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone:   415-743-6900
Facsimile:   415-743-6910
E-mail: sarah.marsey@hklaw.com
         alex.hadduck@hklaw.com

Attorneys for Plaintiff
ARTHUR J. GALLAGHER & CO.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DON TARANTINO, an individual, BERNADETTE HEATER, an individual, MICHAEL MACHETTE, an individual, SPENCER BRUSH, an individual, and ALLIANT INSURANCE SERVICES, INC., a Delaware Corporation,<br><br>Defendants. | CASE NO.:<br><br>**PLAINTIFF ARTHUR J. GALLAGHER & CO.'S COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

COMPLAINT                                               Case No.: _____

Comes now Plaintiff ARTHUR J. GALLAGHER & CO. ("Gallagher") for its Complaint against DON TARANTINO, BERNADETTE HEATER, MICHAEL MACHETTE, SPENCER BRUSH (together, the "Individual Defendants"), and ALLIANT INSURANCE SERVICES, INC. ("Alliant," and, collectively with the Individual Defendants, the "Defendants") and alleges:

## NATURE OF THE CASE

1.      For at least nine months, Alliant, a direct competitor of Gallagher in the competitive insurance brokerage market, has conspired with key Gallagher executives in the Bay Area, *while they were still employed by Gallagher,* to raid Gallagher's Northern California operations, steal confidential information and trade secrets, and target key performers to improperly gain access to protected client and employee information and use it to take millions of dollars in business.

2.      In a mass resignation coordinated by Alliant and Individual Defendants, more than 10 employees left Gallagher over a span of five days without providing any notice or transition period and immediately began working for Alliant.  This coordinated attack on Gallagher was planned over several months.  The attack included the stealing of key customer data, active solicitation of Gallagher customers in the weeks leading up to the employees' departures (including golf outings during the COVID-19 quarantine period charged to Gallagher less than a month prior to the resignations), and efforts to sabotage Gallagher's ability to keep its customers.  As part of this coordinated attack, nearly *fifty (50) customers left Gallagher within a few days* of the mass resignation.  In a span of weeks, Alliant successfully *poached 15 employees* from Gallagher, and, with the assistance of the Individual Defendants, is continuing to target additional key Gallagher employees, using confidential information on relationships, salary and benefits to do so.

3.      Defendants coordinated the mass departure over months while the Individual Defendants were still employed by Gallagher to maximize disruption on Gallagher's operations (during the unprecedented COVID-19 pandemic) and benefit from Gallagher's confidential information to create and unfairly take advantage of the appearance of instability.  Defendants then called additional Gallagher employees, encouraged those employees to move to Alliant, and then told customers that additional key Gallagher employees would be joining Alliant to further coerce the customers or employees to move.  For example, Defendants told a key customer that its service

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

manager ("CSM") with whom the customer had a close relationship would be joining Alliant.  The customer planned to move its business; however, when the customer learned that the CSM was not joining Alliant as indicated, the customer stayed with Gallagher.

4.      In addition to encouraging Individual Defendants to violate their agreements and fiduciary duties, Alliant also caused or encouraged the Individual Defendants to misappropriate *hundreds of Gallagher internal documents* containing confidential and/or trade secret information. These bad acts subject Gallagher to irreparable harm, devalue Gallagher's confidential and trade secret business information through improper use and/or dissemination, and have caused Gallagher to lose valuable customer accounts and employees.

5.      Both Don Tarantino ("Tarantino") and Michael Machette ("Machette") previously sold their insurance agencies to Gallagher for significant monies several years ago.  As a result, both are subject to post-termination restrictions on the solicitation and service of insurance-related customers of Gallagher or from soliciting Gallagher employees for other employment opportunities. *Several of the clients stolen by Defendants in violation of these agreements are the very same ones that Tarantino and Machette conveyed to Gallagher in the acquisitions.*  Upon information and belief, Alliant has structured its deals with Tarantino and Machette not in the typical nature of employment agreements but with large compensation packages more akin to a purchase of these clients from Tarantino and Machette, even though the clients were Gallagher clients.  Alliant did so because it conspired with Tarantino and Machette to remain employed as double agents with Gallagher for many months to steal confidential information, solicit customers for Alliant, and solicit employees of Gallagher to ensure that the business would move.

6.      Alliant's conduct is consistent with its national strategy of stealing business unlawfully from competitors, which often results in the imposition of injunctions and other negative rulings against it.  Indeed, Alliant touts a growth strategy of "leveraged" hires—in reality, raids—of high-end producers from competing firms with the goal of stealing existing books of business and the employees who service those accounts.  In many cases, as is the case here, Alliant targets producers who joined a competitor in connection with an acquisition of an existing book of

2

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

business.  This has resulted in a string of lawsuits accusing Alliant of committing many of the same tortious acts that characterize its ongoing raid on Gallagher.

7.     For example, Alliant's acts here are consistent with acts that caused a Delaware court to issue a scathing rebuke of Alliant's unlawful employee raiding utilized against Lockton Co., another insurance broker.  *See Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, 2019 WL 2536104 (Del. Ct. Chnc. 2019).  In a 60-page injunction order, the Delaware court found that Alliant engineered the mass resignations of employees and encouraged the improper taking of confidential information and violations of employees' agreements and duties.  The Delaware court found that Alliant spent months recruiting and then working closely with those employees to plan and coordinate their departures, with some employees working with Alliant while employed by Lockton to solicit Lockton customers and employees for Alliant.  In addition, Alliant was found to have encouraged the misappropriation of documents, and offered attractive indemnification clauses knowing full-well that a lawsuit was likely to follow.

8.     Here, Alliant is following its modus operandi and continues the same unlawful conduct for which it has already been enjoined in multiple jurisdictions.  Alliant, being well-practiced in its unlawful competition, has developed policies designed to hide its bad acts.  In fact, the *Lockton v. Alliant* court found that Alliant employees, and their new hires, were instructed to avoid written communications with each other and the clients and employees they were targeting, and even received instruction from Alliant's attorneys to destroy certain documents evidencing Alliant's tortious conduct.  Alliant's lawyers apparently considered the destruction of evidence "a start."  While Gallagher has already uncovered facts establishing misappropriation and contractual breaches, and other bad acts, Gallagher suspects that Alliant has already taken steps to hide or conceal its wrongfulness.  Gallagher brings this suit to protect its confidential and trade secret business information and to protect its employees and customer accounts from unlawful competition.

## GENERAL ALLEGATIONS

9.     Gallagher is a global insurance brokerage and risk management services firm.  Alliant attempts to compete with Gallagher.  In violation of binding agreements and California law,

COMPLAINT                                                                                    Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

Alliant has conspired with the Individual Defendants to steal Gallagher's trade secrets, confidential information, clients, and employees in a premediated and coordinated corporate raid.

**Gallagher Acquires S.P. Tarantino Insurance Brokerage, Inc. and Crist Elliott Machette Insurance Services, Inc., Including all Customer Accounts and Customer Goodwill**

10.     In July 2006, Gallagher acquired S.P. Tarantino Insurance Brokerage, Inc. ("Tarantino Brokerage"), a full service retail insurance brokerage offering risk management and commercial insurance.  Gallagher acquired all of Tarantino Brokerage's customer accounts and business goodwill, and hired Defendant Tarantino, a stockholder, officer, and director of Tarantino Brokerage at the time, to manage and service the acquired business on behalf of Gallagher.

11.     In connection with the sale of his business to Gallagher, Tarantino agreed to an employment agreement with Gallagher dated July 11, 2006, attached hereto as **Exhibit A** (the "Tarantino Agreement")[1].  The Tarantino Agreement confirmed that its entry was directly tied to Gallagher's acquisition of the Tarantino Brokerage, including its goodwill.  Exh. A, recitals.

12.     The Tarantino Agreement also required Tarantino to protect Gallagher's confidential business information after the termination of his Gallagher employment, including the return of all Gallagher business information and property.  Exh. A, § 7.  In addition, the Tarantino Agreement precluded Tarantino from soliciting or serving ***insurance-related customers*** of Gallagher or from soliciting ***Gallagher employees*** for other employment opportunities for two years after termination of his employment relationship with Gallagher.  Exh. A, § 8.

13.     In January 2008, shortly after Gallagher's acquisition of Tarantino Brokerage, Gallagher acquired Crist Elliott Machette Insurance Services, Inc. ("CEM"), a retail insurance brokerage offering risk management, commercial property/casualty, and personal lines of insurance products and services.  CEM specialized in the real estate and construction industries.  Gallagher acquired all of CEM's customer accounts and business goodwill.  Defendant Machette was a principal stockholder, officer, director and/or key employee of CEM.

---

[1] The Employment Agreements attached as Exhibits A – B to this Complaint are redacted to protect sensitive information. An unredacted copy of the agreements will be provided to the Court under seal upon entry of a confidentiality order, if requested.  Defendants already have copies of the unredacted agreements, but Plaintiff will provide additional copies upon request.

COMPLAINT                                                            Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

14.     In connection with the sale of his business to Gallagher, Machette agreed to an employment agreement with Gallagher dated January 30, 2008, attached hereto as **Exhibit B** (the "Machette Agreement").  The Machette Agreement confirmed that its entry was directly tied to Gallagher's acquisition of CEM, including its goodwill.  Exh. B, recitals.  The Machette Agreement contained confidentiality obligations and precluded Machette from soliciting or serving insurance-related customers of Gallagher or from soliciting Gallagher employees for other employment opportunities for two years after the termination of his employment relationship with Gallagher.  Exh. B, §§ 7-8.  In addition, the Machette Agreement included a covenant of non-competition that precluded Machette from, directly or indirectly, competing with Gallagher within a 25 mile radius of the location of any Gallagher client or customer.  Exh. B, § 8.

15.     At all times relevant to this Complaint, Tarantino managed/oversaw the book of business that Tarantino Brokerage sold Gallagher in 2006, and Gallagher supported Tarantino's efforts to retain and grow this business.

16.     In 2009, Tarantino was promoted to Chairman of Gallagher's Bay Area operations, a high level manager of Gallagher.  In this role, Tarantino was responsible for assisting regional and branch management in various areas including but not limited to providing advice and guidance in managing Gallagher's San Francisco operations, identifying acquisition opportunities, and providing oversight over employees working on his accounts.

17.     Tarantino was paid a management fee in addition to his broker salary, and was part of Gallagher's management team that made important strategic decisions on key issues such as recruiting and mergers and acquisitions.  As Chairman of Gallagher's Bay Area operations, Tarantino also used Gallagher's trade secrets and confidential information to foster and grow the business that he had sold to Gallagher.

18.     At all times relevant to this Complaint, Machette managed/oversaw the book of business that CEM sold Gallagher in 2008, and Gallagher supported Machette's efforts to retain and grow this business.  During this time, Machette was Gallagher's Area President for the San Francisco area.  In that role, Machette acted as a senior producer of Gallagher, and assisted with managing Gallagher's operations in the Lafayette, California office.  As Area President of

COMPLAINT                                                          Case No.: _____

Gallagher's Lafayette office, he also used Gallagher's trade secrets and confidential information to foster and grow the business that he had sold Gallagher in 2008.

**Alliant Coordinates a Defection of Fifteen Gallagher Employees, Including Tarantino and Machette, Encouraging Misappropriation of Information And Contractual Breaches**

19.     In 2019, and unbeknownst to Gallagher, Alliant began planning a mass defection of Gallagher employees from Gallagher's San Francisco and Lafayette offices.  Upon information and belief, Alliant's primary recruitment efforts were of Tarantino and Machette, two Gallagher leaders and producers that Alliant knew had previously sold their books of business to Gallagher.  Upon information and belief, Alliant knew that cross-selling capabilities existed between the Gallagher accounts serviced by both Tarantino and Machette, and believed that, despite their non-solicitation obligations and fiduciary duties, both Tarantino and Machette would be able to bring both customers and employees to Alliant if the price was right.

20.     For months, Alliant used Gallagher employees as double-agents.  While Gallagher believed that its employees were conducting business for the benefit of Gallagher, in reality, the defecting employees were already carrying-out Alliant's objectives.  Among those objectives was a mass misappropriation effort that spanned months and resulted in the potential dissemination and misuse of hundreds of Gallagher confidential and/or trade secret business documents.

21.     Defendant Bernadette Heater ("Heater") is a former employee of the Tarantino Brokerage who joined Gallagher with Tarantino.  Heater worked closely with Tarantino at Gallagher, and left Gallagher to join Alliant together with Tarantino.  After Alliant's recruitment of Tarantino, and presumably after a deal in principle was reached, Heater began mass-emailing Gallagher's confidential and/or trade secret business information to her personal email account. Upon information and belief, Heater emailed these materials to her personal account at the direction of, and for the benefit of, Alliant and Tarantino.  Upon information and belief, Tarantino and Alliant used Heater to steal this information, knowing that she was not as high-level of an employee as Tarantino in an attempt to shield Tarantino from these wrongful acts.

22.     In the months and days leading up to Heater's and Tarantino's Gallagher resignations, Heater sent hundreds of documents to her personal email account, including

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

COMPLAINT                                                        Case No.: _____

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

(1) current Gallagher client lists, which include information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences; (2) internal Gallagher documents and strategies regarding client policy structuring, client premium reports, and extensive budget and other financial information regarding Gallagher's business; and (3) client retention and renewal strategies and information, among other confidential and/or trade secret information.  For example, the following documents are just some of the misappropriated records:

- Gallagher's proprietary strategy for securing clients' renewal of insurance policies, including step-by-step renewal processes and workflow assignments by position. Heater emailed this proprietary information to her personal email account on April 2, 2020;

- A list containing critical contact information for Gallagher-assigned underwriters at insurance carriers working on the Tarantino accounts, including email addresses, phone numbers, and billing and audit contacts.  Heater emailed this proprietary information to her personal email account on June 23, 2020;

- A document titled "customerreports," which contains an executive summary of claims for all lines of insurance coverage for an account that has since left Gallagher to join Alliant.  Heater emailed this proprietary information to her personal email account on April 16, 2020;

- A proprietary Gallagher client list, complete with customer addresses, email addresses, and primary points of contact for e Tarantino's Gallagher accounts. Heater emailed this proprietary information to her personal email account on June 11, 2020;

- A proprietary Gallagher spreadsheet identifying certain of Gallagher's clients, carriers associated with those clients, premiums, policy numbers, expiration dates, and a description of coverage.  Heater emailed this proprietary information to her personal email account on June 18, 2020.

- Renewal quotes and policies for a July 1, 2020 renewal regarding a valuable Gallagher client who has since left Gallagher in favor of Alliant.  Heater emailed this information to her personal email account on May 5, 2020;

- Historical insurance premium information for a valuable Gallagher client who has since left Gallagher in favor of Alliant.  Heater emailed this information to her personal email account on June 5, 2020;

- Analyses of client's properties and premiums for a valuable Gallagher client who has since left Gallagher in favor of Alliant.  Heater emailed this information to her personal email account on June 29, 2020;

7

COMPLAINT

Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

- A resume for a potential Gallagher recruit who Defendants' later recruited in favor of Alliant.  Heater emailed this candidate's resume to her personal email account on June 1, 2020;

The above list of misappropriated materials is a sampling of stolen information and is not exclusive; in fact, *hundreds of additional documents were misappropriated in the Defendants' coordinated attack on Gallagher*.

23.     The misappropriated information constitutes the lifeblood of Gallagher's client service, retention, and business strategies. This information includes client-tailored product structuring strategies and client preference information that was generated by the longstanding relationships Gallagher fosters with its clients over the course of years, and at great cost. Gallagher generates this information through costly and proprietary methods, which have been refined through trial and error, significant analysis and data, and decades of business practice. Gallagher invests considerable time, resources, money, and ingenuity in developing the information stolen by the Defendants.

24.     Like Tarantino and Heater, Machette, together with Defendant Spencer Brush ("Brush"), Machette's son-in-law who joined him as an insurance broker at Gallagher in 2012, also began misappropriating information from Gallagher leading up to their Gallagher resignations and Alliant employment.  Upon information and belief, Brush and Machette did so at the direction of, and for the benefit of, Alliant.  Like the team of Tarantino and Heater, the Machette/Brush team serviced many of the same accounts at Gallagher, and information emailed to Brush's personal email account related to those Gallagher clients.  The Machette/Brush misappropriation materials include emails containing Machette's Gallagher clients' contact information and policy information, which emails were sent to Brush's personal email account between April and July, 2020.  Gallagher continues to investigate additional misappropriation.

25.     In addition to violating both federal and California law for the role they played in misappropriating Gallagher's business information for Alliant's benefit, both Heater and Brush also had employment agreements with Gallagher containing confidentiality obligations.  Both Heater and Brush violated their employment agreements when, upon information and belief, they

8

disseminated and misused Gallagher's confidential and/or trade secret information.  The Heater

Agreement, wherein she agreed that "for a period of two (2) years following the termination of her

employment, she will not divulge the Company's Confidential Information or make use of it for

[her] own purpose or the purpose of another," is attached as **Exhibit C**.  *See* Exh. C, ¶ 13. The

Brush Agreement, containing similar obligations, is attached as **Exhibit D**.  *See* Exh. D, § 7(B).

26.     Upon information and belief, simultaneous with their plan to misappropriate

Gallagher's confidential and/or trade secret information, and in violation of the fiduciary duties

Machette and Tarantino owed to Gallagher, the Defendants schemed to solicit and steal as many

Gallagher customers and employees as they could muster.

27.     While other Californians were restricted in their movement and livelihood because

of a global pandemic, Tarantino, while still employed by Gallagher, hosted golfing outings, dined

with, and solicited Gallagher's clients to move their business to Alliant, all at Gallagher's expense,

within the weeks prior to his resignation from Gallagher. These are some of the same clients

Tarantino sold to Gallagher and continued to service on Gallagher's behalf.

28.     For example, on or about June 19-20, 2020, Tarantino took at least two of

Gallagher's long-time clients to golf and dinner.  Upon information and belief, the purpose of these

client outings was to solicit their business for Alliant.  Tarantino charged these outings to Gallagher.

On or about that time, Heater stole confidential information and/or trade secret documents

regarding these same two clients, emailing key information on the accounts from her Gallagher

email account to her personal account.

29.     Less than one month later, on July 13, 2020, Tarantino and Heater tendered their

resignations to Gallagher, effective immediately.  Two other Gallagher employees, Salvatore

Tarantino and Taylor Tarantino, both sons to Tarantino, tendered their Gallagher resignations the

same day in favor of Alliant, also effective immediately.

30.     Within days of Tarantino's departure from Gallagher, those same clients that he had

wined and dined on Gallagher's dime on June 19-20 terminated their business relationship with

Gallagher in favor of Tarantino at Alliant.

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

9

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

31.     Several of the accounts Gallagher acquired from the Tarantino Brokerage, and/or that Tarantino serviced on behalf of Gallagher, have already left Gallagher to join Alliant.  Upon information and belief, in violation of the duties of care and loyalty Tarantino owed to Gallagher, and in violation of the Tarantino Agreement, Tarantino had told Alliant, during his Alliant recruitment, that these same accounts would leave Gallagher and follow him to Alliant.  Upon information and belief, Alliant agreed to pay Tarantino a higher compensation to induce these breaches.

32.     On information and belief, Tarantino has effectuated these client solicitations either personally or through the use of straw-men, including his two sons Salvatore and Taylor Tarantino, and solicited and is continuing to solicit Gallagher's clients and employees indirectly through his sons and/or is using Gallagher's confidential information to do so.  On information and belief, this is pursuant to a common strategy devised by the Defendants to circumvent the valid and enforceable non-solicitation and non-compete covenants in Tarantino's employment agreement.  Additionally, Taylor and Salvatore Tarantino failed to return their Gallagher-issued laptops containing Gallagher trade secrets until July 30, 2020, more than two weeks after their departure.

33.     Like Tarantino, as a high-level employee—and therefore fiduciary—of Gallagher, Machette owed Gallagher a duty of loyalty and care.  Upon information and belief, and unbeknownst to Gallagher, Machette was in discussions with Alliant as early as December 2019 regarding his recruitment to Alliant.  Upon information and belief, and in violation of his duty of loyalty and care, Machette advertised to Alliant that, if Alliant hired him, he would bring with him many of the same customer accounts he sold to Gallagher.  In other words, while still employed as a high-level manager at Gallagher, Machette was advising Alliant that he would solicit his current Gallagher clients to leave Gallagher in favor of his new employer, in violation of his employment agreement and his fiduciary duties.  Moreover, upon information and belief, in violation of his duty of loyalty and his employment agreement, Machette was soliciting Gallagher employees, including Brush, to move with him.

34.     On July 27, 2020, two weeks after Alliant coordinated the resignations of Tarantino and Heater, among others, with no notice, Machette resigned from Gallagher to join Alliant.

10

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

Machette's resignation was effective immediately.  At least two of the clients Machette provided services to at CEM/Gallagher have now moved to Alliant, and one of the clients whose information Brush misappropriated in May and June of 2020 has since left Gallagher for Alliant.  Importantly, Machette was actively reaching out to his clients to solicit their business for Alliant *while still a Gallagher employee*.

35.     In addition to diverted customer accounts, and immediately following their Gallagher resignations, Alliant and the four Individual Defendants have worked together to cause *ten additional Gallagher employees to leave Gallagher in favor of Alliant*. Many of these Gallagher employees worked directly with either Tarantino or Machette at Gallagher, servicing the same accounts that Alliant is now working to actively steal from Gallagher. Upon information and belief, the recruitment of these employees to Alliant was un-prompted, and included overtures and solicitations of targeted employees at increased compensation rates. For example, Heater contacted at least one Gallagher employee to encourage her to move to Alliant. That employee then reached out to Alliant and promptly received an offer with specific compensation slightly higher than her Gallagher compensation. Upon information and belief, Defendants knew which employees to target at Gallagher and how much to offer based on misappropriated compensation and performance information the Individual Defendants acquired at Gallagher.

36.     Defendants' solicitation of other Gallagher employees and customers, which remains on-going is pursuant to a common strategy devised by the Defendants to circumvent the valid and enforceable non-solicitation, non-compete, and or confidentiality obligations contained in the Individual Defendants' agreements with Gallagher.

### Alliant Has Acted Consistent With Its Business Model of Unfair Competition

37.     Alliant is undertaking a coordinated raid on Gallagher's officers, employees, and clients. Alliant hired the Individual Defendants with knowledge that the Individual Defendants were bound by certain non-solicitation and confidentiality obligations in their employment contracts. Alliant encouraged the Individual Defendants to breach these provisions and defect to Alliant, and the Individual Defendants did so, bringing Gallagher's confidential information, trade secrets, customers, and other employees along with them. Gallagher has already lost millions of dollars

11

from this tortious activity, and stands to lose even more as the Defendants continue to use Gallagher's own confidential information and trade secrets to unfairly compete with Gallagher in violation of their contractual, statutory, and common law duties to Gallagher. Gallagher also continues to suffer irreparable harm as Defendants remain in active solicitation of additional Gallagher employees and customer accounts.

38.     Consistent with its business model of unfair competition, Alliant targeted Tarantino and Machette, key high-level Gallagher employees with substantial books of business, and then knowingly induced both of them to breach their employment contracts and to unlawfully compete with Gallagher, including through the unlawful solicitation of customers and employees.

39.     On information and belief, Alliant specifically encouraged the Individual Defendants to solicit other key employees away from Gallagher to service the accounts they intended to steal from Gallagher, all in violation of enforceable agreements and federal and California law. Indeed, the two separate books of business Alliant targeted here, that of Tarantino and Machette, are unique in that the customer accounts have cross-selling capabilities. In order to effectively cross-sell a full complement of insurance-related services to the accounts Alliant planned to steal, Alliant sought to emulate the prior Gallagher team servicing these accounts. Alliant accomplished this through above-market compensation promises and incentives, and the implementation of a business strategy that encouraged the breach of agreements and law.

40.     On information and belief, Alliant also encourages the Individual Defendants, and each of the other defecting Gallagher employees at issue here, to leave without notice, which made it substantially harder for Gallagher to retain the lost business. This is because no transition plan was in place, and no transition information for the accounts was provided. Alliant encourages resignations without notice to gain an unfair competitive edge, and does so despite knowing that most of the Defendants agreed to provide a resignation notice period and at least two weeks' notice would be professional.

41.     On information and belief, and as further detailed above, the Individual Defendants' conspiracy to misappropriate Gallagher's confidential information and trade secrets was done at the direction of or encouraged by, Alliant.  On information and belief, Alliant regularly misappropriates

12

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

confidential information and trade secrets of its competitors to poach additional employees and to steal competitors' customer accounts.

42.     Alliant engaged in this conduct with knowledge that its behavior was tortious and that it violated enforceable agreements. Indeed, Alliant is regularly sued, and injunction orders have issued against it, for the exact type of misconduct at issue here (for example, in *Aon Risk Servs. Cos. v. Alliant Ins. Servs.*, 415 F. Supp. 3d 843 (N.D. Ill. 2019), wherein the court enjoined Alliant from poaching employees and using those employees to steal clients and former co-workers, and *Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, 2019 WL 2536104 (Del. Ct. Chnc. 2019), wherein the court issued an injunction order "that would bar Alliant from soliciting [plaintiff's] customers, servicing the [plaintiff] customers that Alliant had captured to date, soliciting [plaintiff's] employees, and using [plaintiff's] confidential information").

43.     On information and belief, Alliant believes that the additional value it receives from gaining immediate access to its competitors' employees, trade secrets, confidential information, and clients is worth the legal exposure Alliant regularly faces for its unfair and unlawful poaching practices.

44.     As of August 5, 2020, the Defendants have successfully caused close to fifty (50) clients and 15 Gallagher employees to transfer to Alliant.

## THE PARTIES

45.     Gallagher is a corporation incorporated under the laws of the state of Delaware with its principal place of business in Rolling Meadows, Illinois. Gallagher has offices in San Francisco and Lafayette, California, where the individual defendants worked and where Gallagher sustained its harm caused by Defendants' conduct.

46.     Upon information and belief, Don Tarantino is a resident of San Rafael, California.

47.     Upon information and belief, Bernadette Heater is a resident of Fairfield, California.

48.     Upon information and belief, Michael Machette is a resident of Orinda, California.

49.     Upon information and belief, Spencer Brush is a resident of Moraga, California.

50.     Upon information and belief, Alliant is a Delaware corporation. Alliant operates dozens of offices in California, including offices in San Francisco and Lafayette, California which

13

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

employed every Individual Defendant. Alliant, like Gallagher, offers insurance brokerage and risk management services, and is a direct competitor of Gallagher.

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States.

52.     This Court has general personal jurisdiction over the Defendants because, on information and belief, each Individual Defendant is domiciled in California, and Alliant's principal place of business is in this state.  In addition, each Defendant's contacts with California are so extensive and substantial as to render each at home in this state.  The Court has specific personal jurisdiction over the Defendants because each has personally availed themselves of California by committing the tortious acts and breaches of contract described herein in California, and causing injury to Gallagher in California.

53.     Venue is appropriate under 28 U.S.C. § 1391(b)(1) because, on information and belief, all Defendants are residents of California, and the Individual Defendants reside in this district.  Venue is furthermore appropriate under 28 U.S.C. § 1391(b)(2) because the tortious conduct and contractual breaches described herein occurred within this district.

## FIRST CAUSE OF ACTION

### (Breach of Contract, Against Tarantino, Machette, Heater, and Brush)

54.     Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

55.     As set forth herein, the Individual Defendants each executed written agreements that provided certain terms. Each written agreement is valid and enforceable.

56.     The agreements were supported by adequate consideration. Gallagher has performed, and at all times stood ready to perform, all the obligations to Individual Defendants which Gallagher undertook in the employment agreements. Gallagher has fulfilled its obligations and complied with any and all conditions and agreements of the employment agreements.

57.     The Individual Defendants have materially breached their employment agreements in at least the following ways:

14

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

a.      <u>As to Tarantino:</u>

i.      Soliciting Gallagher clients to leave Gallagher for Alliant is a breach of the non-solicitation provision in Section 8 of the employment contract, which is valid pursuant to Cal. Bus. & Prof. Code § 16601 because, on information and belief, the non-solicitation provision was part of Tarantino's sale of his ownership interest in a business entity that was selling its goodwill to Gallagher.

ii.     Soliciting the other Individual Defendants and any other Gallagher employees to leave Gallagher for employment at Alliant is a breach of the non-solicitation provision in Section 8 of the employment contract, which is valid pursuant to Cal. Bus. & Prof. Code § 16601 because, on information and belief, the non-solicitation provision was part of Tarantino's sale of his ownership interest in a business entity that was selling its goodwill to Gallagher.

iii.    Taking Gallagher's confidential information and trade secrets with him to Alliant is a breach of Section 7 of the employment contract.

b.      <u>As to Machette:</u>

i.      Soliciting Gallagher clients to leave Gallagher for Alliant is a breach of the non-solicitation provision in Section 8 of the employment contract, which is valid pursuant to Cal. Bus. & Prof. Code § 16601 because, on information and belief, the non-solicitation provision was part of Machette's sale of his ownership interest in a business entity that was selling its goodwill to Gallagher.

ii.     Soliciting the other Individual Defendants and any other Gallagher employees to leave Gallagher for employment at Alliant is a breach of the non-solicitation provision in Section 8 of the employment contract, which is valid pursuant to Cal. Bus. & Prof. Code § 16601 because, on information and belief, the non-solicitation provision was part of Machette's sale of his ownership interest in a business entity that was selling its goodwill to Gallagher.

iii.    Working for Alliant is a breach of the non-compete provision of Section 8 of the employment contract, which is valid pursuant to Cal. Bus. & Prof.

15

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

Code § 16601 because, on information and belief, the non-solicitation provision was part of Machette's sale of his ownership interest in a business entity that was selling its goodwill to Gallagher.

    iv.  Taking Gallagher's confidential information and trade secrets with him to Alliant is a breach of Section 7 of the employment contract.

  c.  <u>As to Heater</u>:

    i.  Taking Gallagher's confidential information and trade secrets with her to Alliant is a breach of Paragraph Thirteen of the employment contract.

  d.  <u>As to Brush</u>:

    i.  Taking Gallagher's confidential information and trade secrets with him to Alliant is a breach of Section 7 of the employment contract.

58.  Gallagher has been damaged by these breaches in an amount to be determined at trial, but in excess of millions of dollars.  Among other things, Gallagher has been significantly damaged by business lost to Alliant due to Tarantino's, Machette's, Heater's, and Brush's breaches of their employment contracts.

## <u>SECOND CAUSE OF ACTION</u>

### **(Trade Secret Misappropriation in Violation of 18 U.S.C. §§ 1832 et seq., Against All Defendants)**

59.  Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

60.  Gallagher operates its business in interstate commerce across the United States.

61.  Gallagher's client lists with information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences, internal discussions and strategies regarding policy structuring, client premium reports, and extensive budget, financial, customer, and other information related to Gallagher's business and client retention and renewal strategies amongst other proprietary business information, qualify as "trade secrets" under the DTSA, as defined under 18 U.S.C. § 1893(3).

16

62. Gallagher's client lists with information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences, internal discussions and strategies regarding policy structuring, client premium reports, and extensive budget, financial, customer, and other information related to Gallagher's business and client retention and renewal strategies amongst other proprietary business information derives independent economic value, actual or potential, from not being generally known; it is not readily ascertainable through proper means and Gallagher has taken reasonable measures to keep such information secret.

63. Gallagher has taken, and continues to take, reasonable and appropriate steps to maintain the secrecy of its confidential and trade secret information, including by:

(a) Requiring Gallagher employees to enter into agreements to govern employment and post-employment obligations;

(b) Ensuring proper procedures are in place at companies it acquires before proceeding with acquisitions, including execution of non-disclosure agreements;

(c) Maintaining confidentiality policies governing the use and disclosure of confidential information, including under Gallagher's Global Standards of Business Conduct, its Electronic Information Policy, and other policies relating to the protection of confidential information;

(d) Providing regular training to employees to protect Gallagher's confidential information;

(e) Requiring rotating/retiring username/password access to Gallagher's proprietary data;

(f) Requiring use of strong passwords for user accounts on both the file and email servers;

(g) Monitoring suspicious activity; and

(h) Using only secure connections to protect servers (secure VPN connections are required when accessing information remotely).

64. During the course of their employment relationship, as acknowledged by their employment agreements, the Individual Defendants were given access to Gallagher's trade secrets and proprietary information, and they had a duty to keep such information confidential and refrain from using that information to Gallagher's detriment.

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

17

65.     Gallagher considers its client lists with information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences, internal discussions and strategies regarding policy structuring, client premium reports, and extensive budget, financial, customer, and other information related to Gallagher's business and client retention and renewal strategies amongst other proprietary business information to be confidential and proprietary, and has taken reasonable steps as part of its ongoing business operations to maintain the confidential nature of this information.

66.     The Individual Defendants have misappropriated Gallagher's trade secrets in the following ways:

a.     By acquiring the trade secrets, knowingly or with reason to know, that they were acquired through improper means, including but not limited to, through misrepresentation or breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets; and

b.     By disclosing or using the trade secrets without consent of Gallagher as part of Alliant's competing business.

67.     Alliant has, in information and belief, misappropriated Gallagher's trade secrets in the following ways:

a.     By acquiring the trade secrets through tortiously directing and encouraging the Individual Defendants to breach their contractual and common law duties to Gallagher by taking the trade secrets from Gallagher for Alliant's benefit; and

b.     By using the trade secrets improperly obtained from Gallagher without Gallagher's consent as part of Alliant's competing business.

68.     On information and belief, Defendants are using, and threaten to further misappropriate, Gallagher's trade secrets on behalf of their competing business unless enjoined.

69.     On information and belief, the Individual Defendants and Alliant were aware that the information taken from Gallagher was protected both as confidential information, and as a trade secret, and worked together with the intention of taking as much of Gallagher's information as possible with them to Alliant.

18

COMPLAINT                                                                                    Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

70.     Defendants' conduct described herein constitutes willful and malicious misappropriation of Gallagher's trade secrets under 18 U.S.C. § 1836(b)(2).

71.     Defendants' misappropriation of Gallagher's trade secrets has caused millions of dollars in harm through the loss of clients which, on information and belief, Alliant poached from Gallagher using Gallagher's trade secrets.

72.     Defendants' misappropriation of Gallagher's trade secrets is causing, and threatens to continue causing, Gallagher to suffer irreparable harm, including but not limited to loss of customers and business, loss of reputation and goodwill, and loss of its investment in its trade secrets.  This harm cannot be adequately remedied at law and Gallagher reserves the right to seek temporary, preliminary, and permanent injunctive relief prohibiting Defendants from using or misappropriating Gallagher's trade secrets.

73.     Gallagher is entitled to full compensatory and consequential damages for its actual loss and for unjust enrichment caused by the Defendants' misappropriation of Gallagher's trade secrets in an amount to be determined at trial.

74.     In addition, on information and belief, Defendants' misappropriation was willful and malicious and Gallagher is entitled to an award of exemplary damages and reasonable attorneys' fees and costs incurred herein pursuant to 18 U.S.C. §1836(b)(3)(C)-(D).

## THIRD CAUSE OF ACTION

**(Trade Secret Misappropriation in Violation of Cal. Civ. Code §§ 3426 et seq., Against All Defendants)**

75.     Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

76.     As set forth above and upon information and belief, Defendants acquired and misappropriated Gallagher's client lists with information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences, internal discussions and strategies regarding policy structuring, client premium reports, and extensive budget, financial, customer, and other information related to Gallagher's business and client retention and renewal strategies amongst other proprietary business information.

19

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

77. This information qualifies as "trade secrets" under the California Uniform Trade Secrets Act ("CUTSA"), as that term is defined in Cal. Civ. Code. § 3426.1.

78. The Individual Defendants have misappropriated Gallagher's trade secrets in the following ways:

    a. By acquiring the trade secrets, knowingly or with reason to know, that they were acquired through improper means, including but not limited to, through misrepresentation or breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets; and

    b. By disclosing or using the trade secrets without consent of Gallagher as part of Alliant's competing business.

79. Alliant has, in information and belief, misappropriated Gallagher's trade secrets in the following ways:

    a. By acquiring the trade secrets through tortiously directing and encouraging the Individual Defendants to breach their contractual and common law duties to Gallagher by taking the trade secrets from Gallagher for Alliant's benefit; and

    b. By using the trade secrets improperly obtained from Gallagher without Gallagher's consent as part of Alliant's competing business.

80. Upon information and belief, Defendants are using, and threaten to further misappropriate, Gallagher's trade secrets on behalf of their competing business unless enjoined.

81. On information and belief, the Individual Defendants and Alliant were aware that the information taken from Gallagher was protected both as confidential information, and as a trade secret, and worked together with the intention of taking as much of Gallagher's information as possible with them to Alliant.

82. Defendants' conduct described herein constitutes willful and malicious misappropriation of Gallagher's trade secrets under the CUTSA.

83. Defendants' misappropriation of Gallagher's trade secrets has caused million dollars in harm through the loss of clients which, on information and belief, Alliant poached from Gallagher using Gallagher's trade secrets.

20

COMPLAINT          Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

84.     Defendants' misappropriation of Gallagher's trade secrets is causing, and threatens to continue causing, Gallagher to suffer irreparable harm, including, but not limited to, loss of customers and business, loss of reputation and goodwill, and loss of its investment in its trade secrets.  This harm cannot be adequately remedied at law and Gallagher reserves the right to seek temporary, preliminary, and permanent injunctive relief prohibiting Defendants from using or misappropriating Gallagher's trade secrets.

85.     Gallagher is entitled to full compensatory and consequential damages for its actual loss and for unjust enrichment caused by the Defendants' misappropriation of Gallagher's trade secrets.

86.     In addition, on information and belief, Defendants' misappropriation was willful and malicious and Gallagher is entitled to an award of exemplary damages and reasonable attorneys' fees and costs incurred herein pursuant to Cal. Civ. Code. § 3426.4.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against Tarantino and Machette)

87.     Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

88.     Defendants Tarantino and Machette were high levels supervisors and managers of Gallagher.

89.     By virtue of their positions of trust, authority, and discretion within Gallagher, Tarantino and Machette owed Gallagher fiduciary duties, including the duty of loyalty.

90.     On information and belief, Tarantino and Machette breached their fiduciary duties to Gallagher by, among other things, conspiring with Alliant to solicit customers and employees from Gallagher while they were still employed at Gallagher.

91.     On information and belief, Tarantino and Machette knew that their solicitation of Gallagher's customers and employees was against Gallagher's interests, and in the best interests of Gallagher's direct competitor, Alliant.

92.     Gallagher did not give informed consent to Tarantino's and Machette's solicitations.

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

21

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

93.     Tarantino's and Machette's solicitations of Gallagher's customers and employees while still working at Gallagher have injured Gallagher by depriving Gallagher of crucial employees and by causing Gallagher to lose valuable customers.  Gallagher has been injured by these breached in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting, Against Alliant)

94.     Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

95.     The acts of unlawful client solicitation, employee solicitation, fiduciary duty breaches, and trade secret and confidential information misappropriation detailed above were done at the behest of, and with substantial assistance from. Alliant.  Indeed, on information and belief, Alliant was aware that it was encouraging the Individual Defendants to breach their fiduciary, statutory, and common law duties to Gallagher by using Gallagher's own trade secrets and confidential information to solicit additional clients and employees for Alliant's gain, including because these wrongful acts took place while the Individual Defendants were still employed by Gallagher.

96.     Alliant had knowledge that Tarantino and Machette, as high-level Gallagher managers, owed fiduciary duties of loyalty and care to Gallagher.

97.     On information and belief, Alliant provided substantial assistance to the Individual Defendants in their unlawful client solicitation, employee solicitations, fiduciary duty breaches, and trade secret and confidential information misappropriation, including because Alliant agreed to indemnify the Individual Defendants from these wrongful acts, and otherwise encouraged the Individual Defendants to commit these wrongful acts through offering lucrative compensation packages that were, in part, based on successful and unlawful client and employee solicitations.

98.     Upon information and belief, Alliant's encouragement of the Individual Defendants to engage in the above wrongful acts is consistent with its unlawful business practices generally.

99.      Alliant's substantial assistance to, and encouragement of the Individual Defendants unlawful client solicitation, employee solicitations, fiduciary duty breaches, and trade secret and

22

1  confidential information misappropriation, has injured Gallagher by depriving Gallagher of crucial

2  employees and by causing Gallagher to lose valuable customers. Gallagher has been injured by

3  Alliant's wrongs in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

4

5  **(Intentional Interference with Prospective Economic Advantage, Against All Defendants)**

6      100.   Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth

7  herein.

8      101.   Defendants knew that Tarantino and Machette, as high level managers and client

9  contacts at Gallagher, had influential relationships with Gallagher clients, which were developed

10  and strengthened over the years by virtue of Tarantino's and Machette's access to and knowledge of

11  Gallagher's confidential and trade secret information, which Tarantino and Machette used to form

12  successful relationships with Gallagher's clients.

13      102.   Despite knowing of these contracts and existing business relationships, Defendants

14  intentionally interfered with Gallagher's relationships by soliciting Gallagher's clients, including

15  the clients that, on information and belief, Tarantino and Machette purposefully solicited over the

16  past six months to leave Gallagher when they did, to cease their business with Gallagher and join

17  them at Alliant.  Defendants engaged in wrongful conduct in doing so, by (among other things)

18  breaching their written and enforceable contractual obligations by refraining from doing so,

19  misappropriating Gallagher's trade secrets and confidential information to assist in the successful

20  solicitation of Gallagher's clients, and breaching or encouraging the breach of Tarantino's and

21  Machette's fiduciary duties to Gallagher, all of which was outside the boundaries of fair

22  competition.

23      103.    Defendants were aware that this conduct would disrupt Gallagher's business

24  relationships, and intended this disruption to occur for the benefit of themselves and Alliant.

25      104.   Gallagher has been damaged in amount according to proof at trial as a result of this

26  interference.

27

28

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

23

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

## SEVENTH CAUSE OF ACTION

### (Intentional Interference with Contractual Relations, Against Alliant)

105.    Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

106.    On information and belief, Alliant knew that the Individual Defendants had enforceable employment contracts with Gallagher that, among other things, prevented the Individual Defendants from soliciting Gallagher's customers and employees, prevented the Individual Defendants from keeping and/or using Gallagher's confidential information and trade secrets after leaving Gallagher's employment, and required the Individual Defendants to give Gallagher notice before terminating their employment relationships.

107.    On information and belief, Alliant encouraged the Individual Defendants to breach those contractual provisions so that the Individual Defendants could suddenly, and without warning to Gallagher, leave Gallagher's employ while taking Gallagher's customers, employees, and confidential information with them to a direct competitor.  Alliant engaged in wrongful conduct in doing so, by (among other things) encouraging the Individual Defendants to breach their contracts in the ways outlined herein, misappropriating Gallagher's trade secrets and confidential information to assist in the successful solicitation of Gallagher's clients, and by encouraging the breach of Tarantino's and Machette's fiduciary duties to Gallagher, all of which was outside the boundaries of fair competition. Alliant's acts are consistent with its national strategy of stealing business unlawfully from competitors, like Gallagher, which often results in injunctions and other negative rulings being issued against it.  In many cases, as is the case here, Alliant targets producers who joined a competitor in connection with an acquisition of an existing book of business.  This resulted in a string of lawsuits from coast to coast successfully accusing Alliant of committing many of the same tortious acts that characterize its ongoing raid on Gallagher.

108.    Gallagher has been damaged by Alliant's actions in an amount according to proof at trial.

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

## EIGHTH CAUSE OF ACTION

### (Unfair Business Practices in Violation of Cal. Bus. & Prof. Code. §§ 17200, et seq., Against All Defendants)

109.    Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

110.    California Bus. & Prof. Code § 17200 prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.

111.    Defendants committed unlawful, unfair, and/or fraudulent business acts as defined by § 17200 by engaging in wrongful conduct including, but not limited to, unfairly and improperly inducing employees and customers to leave Gallagher in contravention of the employment agreements Defendants knew were in place, by using Gallagher's trade secrets and confidential information to compete with Gallagher, and by encouraging and facilitating breaches of Tarantino's and Machette's fiduciary duties to Gallagher.

112.    As a direct and approximate result of these unlawful, unfair, and/or fraudulent acts and practices, Gallagher has incurred costs in interruptions of service to its clients, must replace the employees Defendants improperly induced to leave Gallagher, has lost valued customers, and is now forced to compete with a competitor that is using Gallagher's own trade secrets and confidential information against it.

## NINTH CAUSE OF ACTION

### (Unjust Enrichment, Against All Defendants)

113.    Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

114.    As more fully set forth above, Defendants have engaged in wrongful conduct, including, but not limited to, unfairly and improperly soliciting customers and employees to leave Gallagher, as well as misappropriating Gallagher's trade secrets and confidential information, in violation of Defendants' contractual, statutory, and common law duties.

115.    As a proximate result of these wrongful acts, Gallagher has suffered injury and damages to its business and good will in an amount according to proof at trial.  Moreover,

COMPLAINT                                                          Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

Defendants have been unjustly enriched by their wrongful conduct, and Gallagher is entitled to the return of these ill-gotten gains, in an amount according to proof.

## TENTH CAUSE OF ACTION

### (Conspiracy, Against All Defendants)

116.    Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

117.    The acts of unlawful client solicitation, employee solicitation, and trade secret and confidential information misappropriation detailed above were the result of a coordinated effort amongst the Individual Defendants and Alliant.  Indeed, on information and belief Alliant was aware that it was encouraging the Individual Defendants to breach their fiduciary, statutory, and common law duties to Gallagher by using Gallagher's own trade secrets and confidential information to solicit additional clients and employees to Alliant's gain, especially when that tortious conduct took place while the Individual Defendants were still employed by Gallagher.  On information and belief, the Individual Defendants were similarly aware that it was both tortious conduct to solicit clients and employees while still working for Gallagher, and that it was tortious conduct to spring their resignations upon Gallagher and then take as much of Gallagher's trade secret and confidential information as they could on their way out the door.

118.    On information and belief, at all relevant times the Defendants coordinated their resignations, their pre-resignation solicitations of Gallagher's clients and employees, and their pre- and post-resignation misappropriation of Gallagher's trade secrets and confidential information, so that the Defendants could maximize the value of their tortious conduct to their new employer—Alliant—by quickly having additional clients and employees join them at Alliant while Gallagher was reeling from the sudden resignations of so many crucial employees.

119.    On information and belief, at all relevant times Defendants Heater, Brush, and Alliant knew that Defendants Tarantino and Machette planned to solicit Gallagher's clients and employees in violation of their fiduciary duties to Gallagher, and in violation with their common law and statutory duties to avoid tortiously interfering with Gallagher's legitimate business interests.  On information and belief Defendants Heater, Brush, and Alliant actively agreed with,

26

approved of, encouraged, and facilitated this tortious conduct and desired it to be committed for the purpose of their joint scheme to secure lucrative employment at Alliant.

120.    On information and belief, at all relevant times Defendants Tarantino, Machette, and Alliant knew that Defendants Heater and Brush intended to misappropriate the trade secrets and confidential information of Gallagher as part of their premeditated plan to leave for Alliant.  On information and belief Defendants Tarantino, Machette, and Alliant actively agreed with, approved of, encouraged, and facilitated this tortious conduct and desired it to be committed for the purpose of their joint scheme to secure lucrative employment at Alliant.

## ELEVENTH CAUSE OF ACTION

### (Temporary and Permanent Injunctive Relief Against All Defendants)

121.    Gallagher repeats, realleges, and incorporates all other paragraphs as if fully set forth herein.

122.    The Defendants in this case have coordinated their efforts to misappropriate Gallagher's client lists with information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences, internal discussions and strategies regarding policy structuring, client premium reports, and extensive budget, financial, customer, and other information related to Gallagher's business and client retention and renewal strategies amongst other proprietary business information.  They have further coordinated their efforts to use this information to lure both clients and additional Gallagher employees away from Gallagher and to Alliant in violation of their contractual and common law duties to Gallagher.

123.    Gallagher has been irreparably harmed by Defendants' conduct.  While some aspects of Defendants' conduct may be reducible to monetary damages, no amount of money can replace the damage to Gallagher's goodwill that Defendants' conduct is causing, nor can money replace the fact that Gallagher's trade secrets are now in the hands of a direct competitor, which is using those trade secrets to poach additional clients and employees from Gallagher.  Indeed, as Tarantino's and Machette's employee agreements make clear, "the injury to [Gallagher] (and, as applicable, its affiliates) from any such breach [of the trade secret and non-solicitation sections of the employment

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

27

agreement] would be incalculable and irremediable, and that money damages would therefore be an inadequate remedy for any such breach."

124.    Gallagher requests the following preliminary and permanent injunctive relief:

    a.   for a period of two years following the last Individual Defendants' resignation, all Defendants, and any individual(s) acting in concert with them, are enjoined from directly or indirectly:

        i.   soliciting, placing, marketing, accepting, aiding, counseling or consulting in the renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services or other insurance administrative or service functions or provide any employee benefit brokerage, consulting, or administration services, in the areas of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability and capital accumulation products, and all other employee benefit areas for, any Gallagher account for which the Individual Defendants performed any of the foregoing functions during the two-year period immediately preceding their termination, whether on behalf of Alliant or otherwise;

        ii.   soliciting, inducing, or recruiting Gallagher employees to join a competitor, including Alliant, or otherwise leave Gallagher; and/or

        iii.   using or disclosing Gallagher's non-trade secret confidential information in any way, and requiring a return of all Gallagher information and a search of Defendants' devices, systems, email, and storage devices to ensure all information has been returned and destroyed;

    b.   for an indefinite period:

        i.   using or disclosing Gallagher's trade secrets in any way

28

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900 Fax: 415.743.6910

1

## **PRAYER FOR RELIEF**

2        WHEREFORE, Gallagher prays for relief as follows:

3        A.      For general damages according to proof at trial;

4        B.      For special, consequential, and other monetary damages according to proof;

5        C.      For injunctive relief and specific performance;

6        D.      For punitive damages, to the extent available;

7        E.      For prejudgment interest;

8        F.      For recovery of its attorneys' fees and costs of suit; and

9        G.      For such other and further relief as the Court may deem just and proper.

10

11    Dated:  August 7, 2020                    HOLLAND & KNIGHT LLP

12

13                                    By: _____
                                              Sarah A. Marsey
14                                            Alex Hadduck

15                                    Attorneys for Plaintiff
                                      ARTHUR J. GALLAGHER & CO.
16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                                    Case No.: _____

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: 415.743.6900  Fax: 415.743.6910

# EXHIBIT A

## EMPLOYMENT AGREEMENT

*# 24068*

EMPLOYMENT AGREEMENT ("Agreement") dated as of July 11, 2006, between

Arthur J. Gallagher & Co. (the "Corporation"), and Donald Tarantino (the "Executive").

<u>RECITALS</u>

WHEREAS, the Executive is the sole stockholder, officer, director and key employee

of S.P. Tarantino Insurance Brokerage, Inc. (the "Acquired Business"), substantially all the goodwill

and  other assets of which are being acquired by the Corporation in a transaction being completed

contemporaneously with this Agreement ("Transaction") by and among Arthur J. Gallagher & Co., a

Delaware corporation ("Gallagher"), Arthur J. Gallagher & Co. Insurance Brokers of California, Inc.,

a California corporation and a wholly owned subsidiary of Gallagher ("Subsidiary"), S.P. Tarantino

Insurance Brokerage, Inc., a California corporation ("Seller"), and Donald Tarantino ("Stockholder")

(the "Purchase Agreement").

WHEREAS, the parties acknowledge that the Corporation has a legitimate interest in

retaining the services of the Executive and the taking of the covenants herein in order to preserve the

value of the Acquired Business;

WHEREAS, the Executive is a signatory to the Agreement, is directly or indirectly

selling a material stake in the Acquired Business, and is substantially and personally benefiting from

the Transaction; and

WHEREAS, the execution of this Agreement is a condition to the effectiveness of the

aforesaid Transaction.

1

NOW, THEREFORE, in consideration of the above recitals and the mutual covenants and agreements set forth below, the parties agree:

Section 1.    <u>Employment and Term.</u>

The Corporation employs the Executive and the Executive agrees to serve as an employee of the Corporation with the duties set forth in Section 2 for a term (the "Term of Employment") beginning on July 1, 2006 and ending on June 30, 2011, unless earlier terminated under Section 4 or 5.  (As used herein, each consecutive 12 month period beginning on July 1 shall be referred to as an "Employment Year".)  Employment of the Executive shall not necessarily cease as of the expiration of the Term of Employment; however, employment thereafter shall be on an at will basis.  Executive shall have the title of Area President of Gallagher-Tarantino (or such other title as is agreed to by the parties hereto) and shall be a full-time employee as a producer for Gallagher-San Francisco.  Executive's place of employment during the Term of Employment shall be within the city of San Francisco, California unless a replacement location is closer to Executive's primary residence or otherwise mutually agreed.

Section 2.    <u>Duties.</u>

(a)    The Executive agrees during the Term of Employment to solicit, handle business for, sell insurance or render services related to insurance on behalf of the Corporation and its subsidiaries and to perform such other duties and assignments relating to the business of the Corporation and its subsidiaries as the management of the Corporation reasonably directs so long as such direction does not unreasonably interfere with Executive's ability to continue pursuit of new and existing business opportunities for the Acquired Business.

(b)     During the Term of Employment the Executive shall, except during customary vacation periods and periods of illness, devote his entire business time and attention to the performance of the duties hereunder and to promoting the best interests of the Corporation and its subsidiaries.  The Executive shall not, either during or outside of normal business hours, directly or indirectly, sell, solicit, service or engage in any aspect of the insurance business for or on behalf of any entity other than the Corporation and its subsidiaries, nor engage in any activity inimical to the best interests of the Corporation and its subsidiaries.

Section 3.     Compensation During Term of Employment.

(a)     Draw.



(b)     Compensation.

3



4



Notwithstanding anything to the contrary set forth above, for the purposes of determining such additional compensation, each of the following conditions shall apply:

(A)     New P&C Customer Revenue and New P&C Business Revenue shall include only the first twelve months of such revenues, and shall only be included once. All revenues shall include only commissions and fees derived exclusively through the personal sales productions efforts of Executive as determined in accordance with the policies and procedures of the Corporation, shall be net of commissions or fees paid to third parties and shall include only revenues billed and effective during the Term of Employment and subsequently collected;

(B)     No revenue included in one of the foregoing categories shall be included in any other category and the revenue shall be included in the category only once;

5

(C)     In the event revenue related to insurance written that was initially produced by Executive is split with the other branch offices of the Corporation due to such branch office's involvement in the production and/or servicing of such business, the percentages used to calculate Executive's compensation hereunder shall be applied only to the revenues retained by the San Francisco office of Subsidiary.

(D)     As used in this section and in Section 3(c), the term "Employment Year" shall mean the twelve month periods commencing on July 1, 2006, 2007, 2008, 2009 and 2010, during which Executive is employed by the Corporation under this Agreement or such shorter period thereof if the Executive's employment terminates before the end of an Employment Year;

(E)     As used in this section, the term "affiliate" shall mean, with respect to any person, any person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such person;

(F)     New and existing employee benefits business shall be handled by Gallagher Benefit Services, Inc. ("GBS"), except for accounts with less than 100 lives which may continue to be written through the current general agent; and

(G)     Without the consent of Executive, customers of the Acquired Business may not be assigned to other employees of the Corporation;

(H)     In the event of the retirement of Salvatore Tarantino from the employ of the Corporation during the Term of Employment, any New Customer Revenue and New Business Renewal Revenue (as these terms are defined in the Employment Agreement dated as of even date herewith by and between Salvatore Tarantino and the Corporation) shall be credited to Executive; and

6

(I)  For the sake of clarity, the term "property and casualty" shall include liability insurance, and the term "employee benefits" shall include life and disability insurance.

(c)  Employee Benefits.  During the Term of Employment, the Executive shall enjoy the customary benefits afforded to employees of the Corporation.  The Executive also shall be entitled to participate in employee benefit plans now or hereafter provided or made available to the Corporation's employees generally, such as group hospitalization, medical, life and disability insurance, and pension plan.  Nothing in this Agreement shall require the Corporation to establish, maintain or continue any of the employee benefits already in existence for employees of the Corporation and nothing in this Agreement shall restrict the right of the Corporation to amend, modify or terminate such employee benefit programs.

(d)  Vacations.  The Executive shall be entitled each year to annual paid vacation benefits of 20 business days, subject to the vacation policies of the Corporation.  The Corporation shall not pay the Executive any additional compensation for any vacation time not used by the Executive.

(e)  Automobile Allowance; Travel and Entertainment Expenses.



Section 4.  Representations.

7

The Executive represents and warrants that, except as he may be so bound by the terms of his employment by the Acquired Business:

(a)  he is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict or prohibit him from undertaking or performing his duties in accordance with this Agreement or that restricts his ability to be employed by the Company in accordance with this Agreement;

(b)  his employment by the Company will not violate the terms of any policy of any prior employer of the Executive regarding competition; and

(c)  his position with the Company, as described in this Agreement, will not require him to improperly use any trade secrets or confidential information of any prior employer, or any other person or entity for whom he has performed services.

Section 5.    Termination of Employment.

(a)  Corporation shall have the right to terminate the employment of Executive prior to the end of the Term of Employment and with no liability on the part of Corporation:

(i)    Upon the death of the Executive;

(ii)   At any time after the Executive commences to receive disability benefits pursuant to the long-term disability plan applicable to employees of Corporation and upon notice to the Executive;

(iii)  Upon the material breach of this Agreement by the Executive after having given the Executive notice of such breach and a reasonable opportunity to cure such breach (provided that no such notice and cure opportunity is required as to any such breach by the Executive of Sections 7 or 8 below); or

8

   (iv) Upon notice to Executive specifying that a "termination for cause" has occurred.  As used herein, the phrase "termination for cause" shall mean a termination of employment based upon the good faith determination of Corporation that one or more of the following events have occurred:

   (A) Material violation of the Arthur J. Gallagher & Co. Code of Business Conduct and Ethics by the Executive, including commission of any dishonest or fraudulent act to the detriment of Corporation, its subsidiary and affiliated corporations;

   (B) The Executive has been convicted of any crime involving moral turpitude or for any felony;

   (C) Continuing failure of the Executive to perform his duties (other than as a result of disability) which duties the Executive has been directed in writing to perform by Executive's superior;

   (D) The loss, for any reason, by the Executive of any licenses or professional registrations which are required for the performance of the Executive's duties hereunder for a period in excess of thirty (30) days; or

   (E) Conduct on the part of the Executive inconsistent with the covenants set forth in Section 8 hereof as if such covenants applied during Executive's employment.

  (b) On thirty (30) days prior notice (the "Notice Period") the Corporation shall have the right to terminate the employment of Executive prior to the end of the Term of Employment for any reason other than for the reasons set forth in Section 4(a) herein, or for no reason.  The Corporation may shorten or eliminate the Notice Period by the payment in a lump sum of an amount equal to the compensation earned under Section 3(b) herein during the Employment Year in which

9

such termination occurs minus the draw paid during such Employment Year, for the remainder of the

Notice Period.  In the event of such a termination, Corporation shall continue to be obligated to pay

to Executive an amount equal to all compensation (based on the calculation of compensation earned

under Section 3(b) herein for the last 12 full months preceding the termination of employment) and

benefits set forth in Section 3 herein, payable as and when payable to employees of the Corporation

generally, until the end of the Term of Employment stated in Section 1 herein; provided, however,

the Corporation's obligation to continue making payments of compensation and benefits shall cease

in the event Executive is in breach of this Agreement

(c)  The Executive shall have the right to terminate his employment with Corporation

prior to the end of the Term of Employment and with no liability on the part of the Executive upon

the material breach of this Agreement by Corporation after having given Corporation notice of such

breach and a reasonable opportunity to cure such breach.

(d)  As of the effective date of termination of the Executive's employment for any

reason, the Executive agrees that the Secretary of the Corporation may, as an irrevocable proxy and

in the Executive's name and stead, execute all documents and things which the Corporation deems

necessary and desirable to effect the Executive's resignation as an officer or director of the

Corporation and its subsidiaries and affiliates.

(e)  The Executive agrees that, prior to the commencement of any new employment in

the insurance business the Executive will furnish the prospective new employer with a copy of this

Agreement.  The Executive also agrees that the Corporation may advise any prospective new

employer of the Executive of the existence and terms of this Agreement and furnish the prospective

new employer with a copy of this Agreement.

(f)   During the period of employment, and after employment termination, the Executive agrees to voluntarily make himself available to the Corporation and its legal counsel, at Corporation's request, without the necessity of obtaining a subpoena or court order, in the Corporation's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter.  The Executive agrees to provide any information reasonably within his recollection.  The Corporation will reimburse the Executive for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at Corporation's option, will arrange to advance the Executive's expenses or incur such expenses directly.

(g) The Executive agrees that, while he is employed by the Corporation, and after the date of termination of his employment hereunder, he shall not make any false, defamatory or disparaging statements about the Corporation, or any of its subsidiaries or affiliates, or the officers or directors of the Corporation or its subsidiaries or affiliates that are reasonably likely to cause material damage to the Corporation, its subsidiaries or affiliates, or the officers or directors of the Corporation or its subsidiaries or affiliates. While the Executive is employed by the Corporation, and after the date of termination of his employment hereunder, the Corporation agrees, on behalf of itself and its subsidiaries or affiliates, that neither the officers nor the directors of the Corporation or its subsidiaries or affiliates shall make any false, defamatory or disparaging statements about the Executive that are reasonably likely to cause material damage to the Executive.

Section 6.        The Corporation's Right to Injunctive Relief; Attorneys' Fees.

The Executive acknowledges that the Executive's services to the Corporation are of a unique character which gives them a special value to the Corporation, the loss of which cannot reasonably or adequately be compensated in damages in an action at law.  The Executive also

11

acknowledges that it would be difficult to measure damage to the Corporation (and, as applicable, its affiliates) from any breach by the Executive of this Agreement (including Sections 7 and 8 herein), that injury to the Corporation (and, as applicable, its affiliates) from any such breach would be incalculable and irremediable, and that money damages would therefore be an inadequate remedy for any such breach.  Accordingly, in addition to any other remedy which the Corporation (and, as applicable, its affiliates) may have at law or in equity, the Corporation shall be entitled to enforce this Agreement and shall be entitled to a temporary restraining order and to preliminary and permanent injunctive relief (without posting bond or other security) to restrain any such breach by the Executive, without showing or providing any actual damage sustained by the Corporation (and, as applicable, its affiliates)..  The Executive agrees to indemnify the Corporation and its affiliates and hold the Corporation and its affiliates harmless against any loss, cost, liability or expense (including lost profits, reasonable attorneys' fees and other costs ) incurred by any of them by reason of the breach or nonfulfillment of any covenant contained in this Agreement (including Sections 7 and 8 herein).  The Executive further agrees that if the Executive breaches any such covenant, the Corporation (and, as applicable, its affiliates) shall be entitled, in addition to all other legal or equitable remedies they may have, to offset and withhold against any such loss, cost, liability or expense any and all amounts of any kind that may then be owing or payable to the Executive pursuant to this Agreement or otherwise.

Section 7.   <u>Trade Secrets and Confidential Information.</u>

(a)   The Executive acknowledges that the Corporation's and its affiliates' business depend to a significant degree upon the possession of information which is not generally known to

12

others, and that the profitability of the Corporation's and its affiliates' business requires that this information remain proprietary to the Corporation and, as applicable, its affiliates.  Accordingly:

(i)     The Executive agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is work for hire performed by the Executive in the scope of his employment.  To the extent that any such intellectual property is determined not to constitute work for hire, or if any rights in any such intellectual property do not accrue to the Corporation as a work for hire, the Executive's signature on this Agreement constitutes an assignment (without any further consideration) to the Corporation of any and all of his respective copyrights and other rights, title and interest in and to all such intellectual property.  The Corporation shall retain all proprietary rights to any and all such intellectual property.  The Executive agrees to execute any documents necessary to perfect the Corporation's interest in such intellectual property upon the Corporation's request.

(ii)    The Executive has been notified by the Corporation, and understands, that the foregoing provisions of this Section 7(a)(i) do not apply to an item of intellectual property for which no equipment, supplies, facilities or trade secret information of the Corporation or any of its affiliates was used and which was developed entirely on the Executive's own time, unless:  (I) the item of intellectual property relates (A) to the business of the Corporation or any of its affiliates or (B) to the Corporation's or any of its affiliates' actual or demonstrably anticipated research and development, or (II) the item of intellectual property results from any work performed by the Executive for the Corporation or any of its affiliates.

(b)     The Executive recognizes that by virtue of the Transaction and his employment by the Corporation, he has had and will be granted otherwise prohibited access to confidential and

13

proprietary data of the Corporation and its affiliates (including of the Acquired Business) which is not known either to their competitors or within the insurance agency, consulting and brokerage business generally.  This information (hereinafter referred to as "Confidential Information") includes, but is not limited to, data relating to the Corporation's and its affiliates' unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and fund investment business and related products and services; business, management and personnel strategies; the criteria and formulae used by the Corporation and, as applicable, its affiliates in pricing their respective insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Corporation and its affiliates have negotiated with various underwriters; lists of prospects compiled by the Corporation's and its affiliates management and research staff; the identity, authority and responsibilities of key contacts at Corporation accounts and accounts of it affiliates, including accounts of the Acquired Business; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; candidate and placement lists; and other data showing the particularized insurance requirements and preferences of the accounts.  The Executive recognizes that this Confidential Information constitutes a valuable property of the Corporation and its affiliates, developed over a long period of time and at substantial expense, and acknowledges the Company's legitimate interest in safeguarding the Confidential Information from disclosure .  Accordingly, the Executive agrees that he will not, at any time during

14

his employment by the Corporation or thereafter, directly or indirectly, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

(c)     Upon termination of employment, Executive shall return to the Corporation all materials and all copies or tangible embodiments of materials, involving Confidential Information, as well as all other property (whether or not constituting or including Confidential Information) of the Corporation and its affiliates, in the Executive's possession or control.  The Executive agrees to represent in writing to the Corporation upon termination of employment that he has complied with the provisions of this Section 7.

Section 8.     Protection of the Corporation's Business.

In order to protect the goodwill and other assets being acquired in the Transaction as well as the other legitimate interests of the Corporation and its affiliates in, among other things, protecting their Confidential Information and account relationships following the Transaction, the Executive hereby agrees to the following covenants, which the Executive acknowledges and agrees are reasonably necessary and tailored to protect the Corporation's and its affiliates' legitimate business interests:

(a)     For a period equal to five (5) years after the Closing Date (as defined in the Purchase Agreement) the Executive will not, directly or indirectly, compete in any way with the Acquired Business anywhere within a 25 mile radius of the location of any client, customer or Prospective Account of the Acquired Business.  For the purposes of this Section 8(a), the term "compete in any way with the Acquired Business" shall mean engaging in or attempting to engage in any business similar to that carried on by the Acquired Business or by the Corporation or any of its affiliates.

15

(b)     For a period equal to the longer of:  (i) five (5) years after the Closing Date, or (ii) two (2) years following the termination of the Executive's employment with the Corporation or any of its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or indirectly, solicit, serve, sell to, divert, receive or otherwise handle insurance-related business with any individual, partnership, corporation, association or other entity that:  (x) is, or within the last two last two (2) years preceding the Closing Date was, a client or customer of the Acquired Business; or (y) is a Prospective Account (as defined below) of the Acquired Business.

(c)     For a period equal to the longer of:  (i) five (5) years after the Closing Date, or (ii) two (2) years following the termination of the Executive's employment with the Corporation or any of its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or indirectly, solicit, place, market, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services or other insurance administrative or service functions for:  (x) any account of the Corporation or any of its affiliates; or (y) any Prospective Account of the Corporation or any of its affiliates, it being understood and agreed that this Section 8(c) does not restrict or limit Section 8(b) or any other provision of Section 8.  For purposes of Sections 7 and 8 hereof, all references to "the Corporation" shall be deemed to include the Acquired Business  If an account of the Corporation or any of its affiliates is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "account of the Corporation or any of its affiliates" as used herein shall include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making

authority with respect to contracting for services of the type rendered by the Corporation or any of its affiliates, and shall not include products or services within any entity, division or operating unit of the Client Group where the management group within the Client Group which has the primary decision making authority with respect to contracting for services of the type rendered by the Corporation or any of its affiliates.

(d)     The Executive recognizes that employees of the Corporation and its affiliates are a valuable resource of the Corporation and its affiliates and are integral to their full enjoyment of the goodwill and other assets acquired in the Transaction.  Accordingly, for a period equal to the longer of : (i) five (5) years after the Closing Date, or (ii) two (2) years following the termination of the employment of the Executive with the Corporation or its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or indirectly, solicit, induce or recruit any employee of the Corporation or its affiliates to leave the employ of the Corporation or its affiliates.

(e) For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement:

(i)     The words "directly or indirectly" as they modify a prohibited activity shall include acting as an employee, officer, director, consultant or other agent or representative of any enterprise or person which so acts and includes any direct or indirect participation in or with any such acting enterprise or person as a creditor, owner, lender, partner, limited partner, joint venturer, investor, member or stockholder, except as a stockholder holding less than a one percent (1%) interest in a corporation whose shares are traded on a national securities exchange or quoted on Nasdaq.

(ii)     The term "Prospective Account" of the Acquired Business or of the Corporation or its affiliates, as applicable, means any entity (other than a then-current account of the

17

Acquired Business or of the Corporation or its affiliates, as applicable) with respect to whom, at any time during the one (1) year period preceding the termination of the Executive's employment, the Executive: (I) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Acquired Business, the Corporation or its affiliates, as applicable, or (II) had material contact or acquired or had access to Confidential Information as a result of or in connection with the Executive's employment with the Acquired Business, the Corporation or its affiliates.

(f)     The Executive agrees that, in the event of a breach of any of the provisions of this Section 8, the time period specified in such provisions shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted to the Corporation or any of its affiliates, as applicable, by a court of competent jurisdiction.  It is the intention of the parties that the Corporation and its affiliates shall enjoy the faithful performance by the Executive of the covenants specified in said Section for the full time periods specified therein.

Section 9.    Assignment.

Except as provided in Section 10 hereof, this Agreement shall not be affected by any merger or consolidation or other reorganization of the Corporation and this Agreement shall be binding upon and shall inure to the benefit of the continuing entity or to any successor in interest to the Corporation.  This Agreement also shall inure to the benefit of any affiliate of the Corporation as provided in this Agreement.  In addition, the Corporation may assign this Agreement to any affiliate corporation of the Corporation, in which event:  (i) such affiliate shall be the employer of the Executive for all purposes; and (ii) except for purposes of Section 10 hereof, all references to "the Corporation" and all rights of the Corporation shall include and inure to the benefit of such

18

employing affiliate.  The Corporation hereby assigns its rights hereunder to Risk Placement Services, Inc.

This Agreement may not be assigned nor obligations hereunder delegated by the Executive.

Section 10.    Release of Certain Obligations.

Notwithstanding anything contained herein to the contrary, the obligations of the Executive contained in Section 8 shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein.  The Corporation shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place.  Failure of the Corporation to send such notice shall not preclude the release of the Executive from the obligations contained in Section 8.  For the purposes of this Section 10, the following definitions apply:

(a)    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

(b)    The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

A.  A Business Combination, unless:

(1)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the

19

Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(2)     the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(3)     the Business Combination is solely between this Corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(4)     all of the following conditions are satisfied:

(i)     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

(A)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)     an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the

acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)  an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)  A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

B.     The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

C.     Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

D.     A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

(c)     The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related Person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a

Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

(d)     The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983.  Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

(e)     The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

(f)     The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

(g)     The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a

23

director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

Section 11.   General.

(a)   The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect.  If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(b)   This Agreement is made in and shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of law principles.

(c)   This instrument contains the entire agreement of the parties and supersedes all other prior agreements, understandings, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, relating to the employment of the Executive by the Corporation, provided that nothing herein shall supersede, limit or otherwise affect the Purchase Agreement or any of the Executive's or the Corporation's rights or obligations thereunder.

(d)   Subject to Section 11(e) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument shall acknowledge that it is an amendment or modification of this Agreement.  Waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition.  Any waiver must be in writing.  No amendment, alteration, modification or waiver may be signed by the Executive on behalf of the Corporation, its assignees, successors or assigns.

24

(e)     To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Corporation and its affiliates the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(f)     All notices given hereunder shall be in writing and shall be sent by registered or certified mail or delivered by hand and, if intended for the Corporation, shall be addressed to it or delivered to it at its principal office for the attention of the Secretary of the Corporation.  If intended for the Executive, notices shall be delivered personally or shall be addressed (if sent by mail) to the Executive's then current residence address as shown on the Corporation's records, or to such other address as the Executive directs in a notice to the Corporation.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

(g)     The use of the male gender in this Agreement includes the female gender.  The words "including" or "include" shall not be interpreted as terms of limitation or exclusion.

(h)     This Agreement may be executed in counterparts, each of which shall be deemed an original copy.

*(Remainder of page intentionally left blank; signature page follows)*

25

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ARTHUR J. GALLAGHER & CO.
a Delaware Corporation

By: _____

Title: _____

_____
Donald Tarantino

26

# EXHIBIT B

Execution Copy

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("Agreement") dated as of January 30, 2008 between Arthur J. Gallagher & Co. (the "Corporation"), and Michael Machette (the "Executive").

### RECITALS

WHEREAS, the Executive is the principal stockholder, officer, director and/or key employee of Crist Elliott Machette Insurance Services, Inc. ("CEM"); and

WHEREAS, contemporaneously with the execution of this Agreement, Executive is selling all of his personal goodwill ("Stockholder Goodwill") in the business he owns and conducts with CEM pursuant to an a Goodwill Purchase Agreement by and among Executive, Arthur J. Gallagher & Co. Insurance Brokers of California, Inc. ("Subsidiary") and Executive (the "Goodwill Purchase Agreement"); and

WHEREAS, also contemporaneously with the execution of this Agreement, substantially all the goodwill and other assets of CEM, not including the Stockholder Goodwill, are being acquired by the Corporation (the "CEM Business") pursuant to a Purchase Agreement by and among the Executive, the Corporation, Subsidiary and CEM (the " CEM Purchase Agreement"); and

WHEREAS, the parties acknowledge that the Corporation has a legitimate interest in retaining the services of the Executive and the taking of the covenants herein in order to preserve the value of the Stockholder Goodwill and the CEM Business (collectively, the "Acquired Business"); and

- 1 -

Execution Copy

WHEREAS, the Executive is a signatory to the Goodwill Purchase Agreement and the CEM Purchase Agreement, is directly or indirectly selling a material stake in the Acquired Business, and is substantially and personally benefiting from the transactions contemplated thereby; and

WHEREAS, the execution of this Agreement is a condition to the effectiveness of the aforesaid Transaction.

NOW, THEREFORE, in consideration of the above recitals and the mutual covenants and agreements set forth below, the parties agree:

Section 1.   Employment and Term.

The Corporation employs the Executive and the Executive agrees to serve as an employee of the Corporation with the duties set forth in Section 2 for a term (the "Term of Employment") beginning on January 30, 2008 and ending on January 30, 2013 unless earlier terminated under Section 5.  Executive shall report to the Western Region manager of the Brokerage Services division ("BSD") of the Corporation.  Employment of the Executive shall not necessarily cease as of the expiration of the Term of Employment; however, employment thereafter shall be on an at will basis.

Section 2.   Duties.

(a)   The Executive agrees during the Term of Employment to solicit, handle business for, sell insurance or render services related to insurance on behalf of the Corporation and its subsidiaries and to perform such other duties and assignments relating to the business of the

- 2 -

Corporation and its subsidiaries as the management of the Corporation reasonably directs. Executive shall work primarily through and with the Construction Services team with BSD.

      (b)    During the Term of Employment the Executive shall, except during customary vacation periods and periods of illness, devote his entire business time and attention to the performance of the duties hereunder and to promoting the best interests of the Corporation and its subsidiaries. The Executive shall not, either during or outside of normal business hours, directly or indirectly, sell, solicit, service or engage in any aspect of the insurance business for or on behalf of any entity other than the Corporation and its subsidiaries, nor engage in any activity inimical to the best interests of the Corporation and its subsidiaries.

      Section 3.    Compensation During Term of Employment.

      (a)    Draw.

      (b)    Compensation.

- 3 -

Execution Copy



**Execution Copy**



Notwithstanding anything to the contrary set forth above, for the purposes of determining such additional compensation, each of the following conditions shall apply:

(A) Revenues from New P&C Customers shall include only the first twelve months of such revenues, shall include only revenues received by the Corporation during the Term of Employment, shall only be included once, shall include only revenues derived exclusively through the personal sales production efforts of Executive and Dennis Butler operating as a team, as determined in accordance with the policies and procedures of the Corporation and shall not include revenues paid to third parties, including but not limited to, co-brokers and sub-brokers;

(B) Renewed Benefits Customers and New GBS Customers shall be serviced by GBS.

- 5 -

(C)  No revenue included in one of the foregoing categories shall be included in any other category and the revenue shall be included in the category only once;

(D)  As used in this section and in Section 3(c), the term "Employment Year" shall mean the twelve month periods commencing on January 1, 2008, 2009, 2010, 2011 and 2012 during which Executive is employed by the Corporation under this Agreement or such shorter period thereof if the Executive's employment terminates before the end of an Employment Year; and

(E)  As used in this section, the term "affiliate" shall mean, with respect to any person, any person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such person.

(F)  Corporation and Executive agree that the intent of the one year period for measuring revenues received is to allow for inclusion of one insurance renewal cycle for the clients in each such period.  Accordingly, to the extent that an unusual timing of payment of a renewal premium by a client or other event would distort unfairly one or more one year periods, the parties agree to equitably adjust revenues to one year periods and allow for more meaningful measurement and comparison.

(c)   Employee Benefits.        During the Term of Employment, the Executive shall enjoy the customary benefits afforded to employees of the Corporation.  The Executive also shall be entitled to participate in employee benefit plans now or hereafter provided or made available to the Corporation's employees generally, such as group hospitalization, medical, life and disability insurance, and pension plan.  Nothing in this Agreement shall require the Corporation to establish, maintain or continue any of the employee benefits already in existence for employees of the

**Execution Copy**

Corporation and nothing in this Agreement shall restrict the right of the Corporation to amend, modify or terminate such employee benefit programs.

(d)     Vacations.     The Executive shall be entitled each year to paid vacation benefits in accordance with the policies of the Corporation. The Corporation shall not pay the Executive any additional compensation for any vacation time not used by the Executive.

(e)     Automobile Allowance.

(f)     Expenses.     Executive shall be entitled to reimbursement of reasonably incurred business expenses in accordance with, and subject to the limitation of, Corporation's policies, practices and practices.

Section 4.     Representations.

The Executive represents and warrants that, except as he may be so bound by the terms of his employment by the Acquired Business:

(a) he is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict or prohibit him from undertaking or performing his duties in accordance with this Agreement or that restricts his ability to be employed by the Corporation in accordance with this Agreement;

(b) his employment by the Corporation will not violate the terms of any policy of any prior employer of the Executive regarding competition; and

- 7 -

(c)  his position with the Corporation, as described in this Agreement, will not require him to improperly use any trade secrets or confidential information of any prior employer, or any other person or entity for whom he has performed services.

Section 5.  Termination of Employment.

(a)  Corporation shall have the right to terminate the employment of Executive prior to the end of the Term of Employment and with no liability on the part of Corporation:

(i)      Upon the death of the Executive;

(ii)     At any time after the Executive commences to receive disability benefits pursuant to the long-term disability plan applicable to employees of Corporation and upon notice to the Executive;

(iii)    Upon the material breach of this Agreement by the Executive after having given the Executive notice of such breach and a reasonable opportunity to cure such breach (provided that no such notice and cure opportunity is required as to any such breach by the Executive of Sections 7 or 8 below); or

(iv)     Upon notice to Executive specifying that a "termination for cause" has occurred.  As used herein, the phrase "termination for cause" shall mean a termination of employment based upon the good faith determination of Corporation that one or more of the following events has occurred:

(A)   Material violation of the Arthur J. Gallagher & Co. Code of Business Conduct and Ethics by the Executive, including commission of any dishonest or fraudulent act to the detriment of Corporation, its subsidiary and affiliated corporations;

Execution Copy

(B)  The Executive has been convicted (including a plea of guilty, nolo contendere or no contest) of any crime involving moral turpitude or for any felony;

(C)  Continuing failure of the Executive to perform his duties (other than as a result of disability) which duties the Executive has been directed in writing to perform by Executive's superior;

(D)  The loss, for any reason, by the Executive of any licenses or professional registrations which are required for the performance of the Executive's duties hereunder for a period in excess of thirty (30) days; or

(E)  Conduct on the part of the Executive inconsistent with the covenants set forth in Section 8 hereof as if such covenants applied during Executive's employment.

(b)  On thirty (30) days prior notice (the "Notice Period") the Corporation shall have the right to terminate the employment of Executive prior to the end of the Term of Employment for any reason other than for the reasons set forth in Section 5(a) herein, or for no reason.  The Corporation may shorten or eliminate the Notice Period by the payment in a lump sum of an amount equal to the Base Salary for the remainder of the Notice Period.  In the event of such a termination, Corporation shall continue to be obligated to pay to Executive an amount equal to all compensation and benefits set forth in Section 3 herein, payable as and when payable to employees of the Corporation generally, until the end of the Term of Employment stated in Section 1 herein; provided, however, the Corporation's obligation to continue making payments of compensation and benefits shall cease in the event Executive is in breach of this Agreement.

(c)  The Executive shall have the right to terminate his employment with Corporation prior to the end of the Term of Employment and with no liability on the part of the Executive upon the material breach of this Agreement by Corporation after having given Corporation notice of such breach and a reasonable opportunity to cure such breach.

(d)  As of the effective date of termination of the Executive's employment for any reason, the Executive agrees that the Secretary of the Corporation may, as an irrevocable proxy and in the Executive's name and stead, execute all documents and things which the Corporation deems necessary and desirable to effect the Executive's resignation as an officer or director of the Corporation and its subsidiaries and affiliates.

(e)  The Executive agrees that, prior to the commencement of any new employment in the insurance business the Executive will furnish the prospective new employer with a copy of this Agreement.  The Executive also agrees that the Corporation may advise any prospective new employer of the Executive of the existence and terms of this Agreement and furnish the prospective new employer with a copy of this Agreement.

(f)  During the period of employment, and after employment termination, the Executive agrees to voluntarily make himself available to the Corporation and its legal counsel, at Corporation's request, without the necessity of obtaining a subpoena or court order, in the Corporation's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter.  The Executive agrees to provide any information reasonably within his recollection.  The Corporation will reimburse the Executive for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at Corporation's option, will

- 10 -

arrange to advance the Executive's expenses or incur such expenses directly.

(g)  The Executive agrees that, while he is employed by the Corporation, and after the date of termination of his employment hereunder, he shall not make any false, defamatory or disparaging statements about the Corporation, or any of its subsidiaries or affiliates, or the officers or directors of the Corporation or its subsidiaries or affiliates that are reasonably likely to cause material damage to the Corporation, its subsidiaries or affiliates, or the officers or directors of the Corporation or its subsidiaries or affiliates.  While the Executive is employed by the Corporation, and after the date of termination of his employment hereunder, the Corporation agrees, on behalf of itself and its subsidiaries or affiliates, that neither the officers nor the directors of the Corporation or its subsidiaries or affiliates shall make any false, defamatory or disparaging statements about the Executive that are reasonably likely to cause material damage to the Executive.

Section 6.        The Corporation's Right to Injunctive Relief; Attorneys' Fees.

The Executive acknowledges that the Executive's services to the Corporation are of a unique character which gives them a special value to the Corporation, the loss of which cannot reasonably or adequately be compensated in damages in an action at law.  The Executive also acknowledges that it would be difficult to measure damage to the Corporation (and, as applicable, its affiliates) from any breach by the Executive of this Agreement (including Sections 7 and 8 herein), that injury to the Corporation (and, as applicable, its affiliates) from any such breach would be incalculable and irremediable, and that money damages would therefore be an inadequate remedy for any such breach.  Accordingly, in addition to any other remedy which the Corporation (and, as applicable, its affiliates) may have at law or in equity, the Corporation shall be entitled to enforce this

**Execution Copy**

Agreement and shall be entitled to a temporary restraining order and to preliminary and permanent

injunctive relief (without posting bond or other security) to restrain any such breach by the

Executive, without showing or providing any actual damage sustained by the Corporation (and, as

applicable, its affiliates).  The Executive agrees to indemnify the Corporation and its affiliates and

hold the Corporation and its affiliates harmless against any loss, cost, liability or expense (including

lost profits, attorneys' fees and other costs ) incurred by any of them by reason of the breach or

nonfulfillment of any covenant contained in this Agreement (including Sections 7 and 8 herein).  The

Executive further agrees that if the Executive breaches any such covenant, the Corporation (and, as

applicable, its affiliates) shall be entitled, in addition to all other legal or equitable remedies they may

have, to offset and withhold against any such loss, cost, liability or expense any and all amounts of

any kind that may then be owing or payable to the Executive pursuant to this Agreement or

otherwise.

Section 7.    Trade Secrets and Confidential Information.

(a)    The Executive acknowledges that the Corporation's and its affiliates' business

depend to a significant degree upon the possession of information which is not generally known to

others, and that the profitability of the Corporation's and its affiliates' business requires that this

information remain proprietary to the Corporation and, as applicable, its affiliates.  Accordingly:

(i)    The Executive agrees that all intellectual property, such as computer

programs, systems or software, developed during his employment or as a result of his employment is

work for hire performed by the Executive in the scope of his employment.  To the extent that any

such intellectual property is determined not to constitute work for hire, or if any rights in any such

- 12 -

**Execution Copy**

intellectual property do not accrue to the Corporation as a work for hire, the Executive's signature on this Agreement constitutes an assignment (without any further consideration) to the Corporation of any and all of his respective copyrights and other rights, title and interest in and to all such intellectual property.  The Corporation shall retain all proprietary rights to any and all such intellectual property.  The Executive agrees to execute any documents necessary to perfect the Corporation's interest in such intellectual property upon the Corporation's request.

(ii)     The Executive has been notified by the Corporation, and understands, that the foregoing provisions of this Section 7(a)(i) do not apply to an item of intellectual property for which no equipment, supplies, facilities or trade secret information of the Corporation or any of its affiliates was used and which was developed entirely on the Executive's own time, unless:  (I) the item of intellectual property relates (A) to the business of the Corporation or any of its affiliates or (B) to the Corporation's or any of its affiliates' actual or demonstrably anticipated research and development, or (II) the item of intellectual property results from any work performed by the Executive for the Corporation or any of its affiliates.

(b)     The Executive recognizes that by virtue of the Transaction and his employment by the Corporation, he has had and will be granted otherwise prohibited access to confidential and proprietary data of the Corporation and its affiliates (including of the Acquired Business) which is not known either to their competitors or within the insurance agency, consulting and brokerage business generally.  This information (hereinafter referred to as "Confidential Information") includes, but is not limited to, data relating to the Corporation's and its affiliates' unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and

- 13 -

fund investment business and related products and services; business, management and personnel strategies; the criteria and formulae used by the Corporation and, as applicable, its affiliates in pricing their respective insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Corporation and its affiliates have negotiated with various underwriters; lists of prospects compiled by the Corporation's and its affiliates management and research staff; the identity, authority and responsibilities of key contacts at Corporation accounts and accounts of it affiliates, including accounts of the Acquired Business; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; candidate and placement lists; and other data showing the particularized insurance requirements and preferences of the accounts.  The Executive recognizes that this Confidential Information constitutes a valuable property of the Corporation and its affiliates, developed over a long period of time and at substantial expense, and acknowledges the Company's legitimate interest in safeguarding the Confidential Information from disclosure.  Accordingly, the Executive agrees that he will not, at any time during his employment by the Corporation or thereafter, directly or indirectly, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

(c)     Upon termination of employment, Executive shall return to the Corporation all materials and all copies or tangible embodiments of materials, involving Confidential Information, as well as all other property (whether or not constituting or including Confidential Information) of the

Corporation and its affiliates, in the Executive's possession or control.  The Executive agrees to represent in writing to the Corporation upon termination of employment that he has complied with the provisions of this Section 7.

<u>Section 8.</u>      <u>Protection of the Corporation's Business.</u>

In order to protect the goodwill and other assets being acquired in the Transaction as well as the other legitimate interests of the Corporation and its affiliates in, among other things, protecting their Confidential Information and account relationships following the Transaction, the Executive hereby agrees to the following covenants, which the Executive acknowledges and agrees are reasonably necessary and tailored to protect the Corporation's and its affiliates' legitimate business interests:

(a)      For a period equal to the longer of:  (i) five (5) years after the Closing Date (as defined in the Purchase Agreement), or (ii) two (2) years following the termination of the Executive's employment with the Corporation or any of its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or indirectly, compete in any way with the Acquired Business anywhere within a 25 mile radius of the location of any client, customer or Prospective Account of the Acquired Business.  For the purposes of this Section 8(a), the term "compete in any way with the Acquired Business" shall mean engaging in or attempting to engage in any business similar to that carried on by the Acquired Business or by the Corporation or any of its affiliates.

(b)      For a period equal to the longer of:  (i) five (5) years after the Closing Date, or (ii) two (2) years following the termination of the Executive's employment with the Corporation or any of its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or

indirectly, solicit, serve, sell to, divert, receive or otherwise handle insurance-related business with any individual, partnership, corporation, association or other entity that: (x) is, or within the last two (2) years preceding the Closing Date was, a client or customer of the Acquired Business or (y) is a Prospective Account (as defined below) of the Acquired Business.

(c)     For a period equal to the longer of: (i) five (5) years after the Closing Date, or (ii) two (2) years following the termination of the Executive's employment with the Corporation or any of its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or indirectly, solicit, place, market, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services or other insurance administrative or service functions for: (x) any account of the Corporation or any of its affiliates for which the Executive performed any of the foregoing functions during the two-year period immediately preceding such termination; or (y) any Prospective Account of the Corporation or any of its affiliates, it being understood and agreed that this Section 8(c) does not restrict or limit Section 8(b) or any other provision of Section 8.  For purposes of Sections 7 and 8 hereof, all references to "the Corporation" shall be deemed to include the Acquired Business  If an account of the Corporation or any of its affiliates is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "account of the Corporation or any of its affiliates" as used herein (I) shall include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by

**Execution Copy**

the Corporation or any of its affiliates, and (II) shall not include products or services within any entity, division or operating unit of the Client Group where the management group within the Client Group which has the primary decision making authority with respect to contracting for services of the type rendered by the Corporation or any of its affiliates is not the same as any management group that falls within the preceding clause.

(d)    The Executive recognizes that employees of the Corporation and its affiliates are a valuable resource of the Corporation and its affiliates and are integral to their full enjoyment of the goodwill and other assets acquired in the Transaction.  Accordingly, for a period equal to the longer of: (i) five (5) years after the Closing Date, or (ii) two (2) years following the termination of the employment of the Executive with the Corporation or its affiliates (as applicable) for any reason whatsoever, the Executive will not, directly or indirectly, solicit, induce or recruit any employee of the Corporation or its affiliates to leave the employ of the Corporation or its affiliates.

(e)  For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement:

(i)    The words "directly or indirectly" as they modify a prohibited activity shall include acting as an employee, officer, director, consultant or other agent or representative of any enterprise or person which so acts and includes any direct or indirect participation in or with any such acting enterprise or person as a creditor, owner, lender, partner, limited partner, joint venturer, investor, member or stockholder, except as a stockholder holding less than a one percent (1%) interest in a corporation whose shares are traded on a national securities exchange or quoted on Nasdaq.

- 17 -

(ii)     The term "Prospective Account" of the Acquired Business or of the Corporation or its affiliates, as applicable, means any entity (other than a then-current account of the Acquired Business or of the Corporation or its affiliates, as applicable) with respect to whom, at any time during the one (1) year period preceding the termination of the Executive's employment, the Executive:  (I) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Acquired Business, the Corporation or its affiliates, as applicable, or (II) had material contact or acquired or had access to Confidential Information as a result of or in connection with the Executive's employment with the Acquired Business, the Corporation or its affiliates, as applicable.

(f)     The Executive agrees that, in the event of a breach of any of the provisions of this Section 8, the time period specified in such provisions shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted to the Corporation or any of its affiliates, as applicable, by a court of competent jurisdiction.  It is the intention of the parties that the Corporation and its affiliates shall enjoy the faithful performance by the Executive of the covenants specified in said Section for the full time periods specified therein.

Section 9.     Assignment.

Except as provided in Section 10 hereof, this Agreement shall not be affected by any merger or consolidation or other reorganization of the Corporation and this Agreement shall be binding upon and shall inure to the benefit of the continuing entity or to any successor in interest to the Corporation.  This Agreement also shall inure to the benefit of any affiliate of the Corporation as provided in this Agreement. In addition, the Corporation may assign this Agreement to any affiliate corporation of the Corporation, in which event:  (i) such affiliate shall be the employer of the

Executive for all purposes; and (ii) except for purposes of Section 10 hereof, all references to "the Corporation" and all rights of the Corporation shall include and inure to the benefit of such employing affiliate.  The Corporation hereby assigns its rights hereunder to Subsidiary.

This Agreement may not be assigned nor obligations hereunder delegated by the Executive.

<u>Section 10.</u>        <u>Release of Certain Obligations.</u>

Notwithstanding anything contained herein to the contrary, the obligations of the Executive contained in Section 8 shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein.  The Corporation shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place.  Failure of the Corporation to send such notice shall not preclude the release of the Executive from the obligations contained in Section 8.  For the purposes of this Section 10, the following definitions apply:

(a)    The term "<u>Hostile Change in Control</u>" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

(b)    The term "<u>Change in Control</u>" of the Corporation means and includes each and all of the following occurrences:

A.  A Business Combination, unless:

- 19 -

(1)      the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(2)      the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(3)      the Business Combination is solely between this Corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(4)      all of the following conditions are satisfied:

(i)    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of

- 20 -

**Execution Copy**

such Business Combination as the highest per share price determined in (A) above bears to the

market price of the Corporation's common stock immediately prior to the commencement of the

acquisition of the Corporation's voting stock that caused such Related Person to become a Related

Person, or

(C)  an amount calculated by multiplying the earnings per

share of the Corporation's common stock for the four fiscal quarters immediately preceding the

record date for determination of stockholders entitled to vote on such Business Combination by the

price/earnings multiple of the Related Person as of the record date as customarily computed and

reported in the financial press.

Appropriate adjustments shall be made with respect to (A),

(B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions;

and

(ii)  A timely mailing shall have been made to the stockholders

of the Corporation containing in a prominent place (x) any recommendations as to the advisability

(or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors

may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable

nationally recognized investment banking or financial services firm as to the fairness from the

financial point of view of the terms of the Business Combination to the stockholders of the

Corporation other than the Related Person (such firm to be engaged solely on behalf of such other

stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such

opinion, to be a firm that has not previously been significantly associated with the Related Person

- 21 -

**Execution Copy**

and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

        B.      The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

        C.      Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

        D.      A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

        (c)      The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related Person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a

**Execution Copy**

Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

(d)     The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

(e)     The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

(f)     The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

(g)     The term "<u>Continuing Director</u>" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "<u>Outside Director</u>" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

<u>Section 11.</u>     <u>General.</u>

(a)     The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect.  If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(b)     This Agreement is made in and shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of law principles.

(c)     This instrument contains the entire agreement of the parties and supersedes all other prior agreements, understandings, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, relating to the employment of the Executive by the Corporation, provided that nothing herein shall supersede, limit or otherwise affect the Purchase Agreement or any of the Executive's or the Corporation's rights or obligations thereunder.

(d)     Subject to Section 11(e) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument shall acknowledge that it is an amendment or modification of this Agreement.  Waiver of any term or condition of this

Execution Copy

Agreement shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition.  Any waiver must be in writing.  No amendment, alteration, modification or waiver may be signed by the Executive on behalf of the Corporation, its assignees, successors or assigns.

(e)    To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Corporation and its affiliates the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(f)    All notices given hereunder shall be in writing and shall be sent by registered or certified mail or delivered by hand and, if intended for the Corporation, shall be addressed to it or delivered to it at its principal office for the attention of the Secretary of the Corporation.  If intended for the Executive, notices shall be delivered personally or shall be addressed (if sent by mail) to the Executive's then current residence address as shown on the Corporation's records, or to such other address as the Executive directs in a notice to the Corporation.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

(g)    The use of the male gender in this Agreement includes the female gender.  The words "including" or "include" shall not be interpreted as terms of limitation or exclusion.

- 25 -

**Execution Copy**

(h)     This Agreement may be executed in counterparts, each of which shall be deemed an original copy.

(i)     In the event that any amounts payable hereunder would subject the Executive to penalties under Internal Revenue Code section 409A, the Corporation and the Executive shall cooperate diligently to amend the terms of this Agreement to avoid, insofar as possible, such penalties while minimizing any adverse impact of any such amendment upon the economic, tax or accounting implications to the Corporation.

*(Remainder of page intentionally left blank -- signature page follows)*

**Execution Copy**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ARTHUR J. GALLAGHER & CO.
a Delaware Corporation

By: _____
Joel C. Kornreich, Vice President


_____
Michael Machette

**Execution Copy**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ARTHUR J. GALLAGHER & CO.
a Delaware Corporation

By: _____
    Joel C. Kornreich, Vice President

_____
Michael Machette

# EXHIBIT C

# EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into this first day of July, 2006, by and between

※ 24064

Bernadette Heater (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER &

CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies including,

without limitation, Arthur J. Gallagher & Co. Insurance Brokers of California, Inc. (hereinafter

collectively referred to as the "Company").

WHEREAS, the Company is acquiring substantially all of the assets and goodwill (the

"Acquired Business") of S.P. Tarantino Insurance Brokerage, Inc., a California corporation

("SPT"); and

WHEREAS, Executive has been employed by SPT; and

WHEREAS, Company desires to employ Executive and to retain the value of the

Acquired Business.

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the

other, the Executive and the Company agree as follows:

## EMPLOYMENT AND REMUNERATION

**Paragraph One.**   The Company agrees to employ and to continue to employ the

Executive in accordance with the terms of this Agreement.  Such employment shall include the

sales and servicing of accounts and prospective accounts of Company.  Company shall provide

Executive with access to the resources and data of the Company to assist Executive in such sales

and servicing activities.

**Paragraph Two.**  The Company agrees that the Executive shall be entitled to the bi-

monthly payment of compensation, an annual paid vacation, and various employee benefit plans.

It is understood and agreed that the Company may from time to time modify the specific terms

and conditions of these entitlements.

**Paragraph Three.**   The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities.   It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

## FIDUCIARY OBLIGATIONS
## OF THE EXECUTIVE

**Paragraph Four.**  The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities.  The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.**  The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency, consulting and brokerage business generally and which has independent economic value to the Company.   This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and fund investment business and related products and services; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts,

2

including accounts of the Acquired Business; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; candidate and placement lists; and other data showing the particularized insurance requirements and preferences of the accounts.  The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense.  Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

**Paragraph Six.**  The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts.  The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.  The Executive agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is work for hire performed by the Executive in the scope of his employment.  The Company shall retain all proprietary rights to any and all such intellectual property.  Executive agrees to execute any documents necessary to perfect Company's interest in such intellectual property upon Company's request.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

**Paragraph Seven.**  The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever.   The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period.  It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

**Paragraph Eight.**  The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement.  It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

**Paragraph Nine.**  The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible.  The Executive further agrees that, during the Notice Period (whether or not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

**Paragraph Ten.**  The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information.  It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

4

**Paragraph Eleven.**   The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

**Paragraph Twelve.**  The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's Personnel Manual.  It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

**Paragraph Thirteen.**

A.     The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure.  Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another.  In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, (i) directly or indirectly, solicit the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions ("insurance services") for, any existing Company account or

any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, or (ii) provide any employee benefit brokerage, consulting, or administration services, in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products, and all other employee benefit areas ("benefit services") the Company is involved with, for any Company account or actively solicited prospective accounts for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.   The term Company account as used in this paragraph shall be construed broadly to include all users of insurance services or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries and the accounts and prospective accounts of the Acquired Business.

  B.  The Executive recognizes that employees of the Company are a valuable resource of the Company.  Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

  **Paragraph Fourteen.**  Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein.  The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that

such event has taken place.  Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.      The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.      The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.      A Business Combination, unless:

(a)      the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)      the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)      the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)      all of the following conditions are satisfied:

(i)      The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

(A)      the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)      an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)      an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)      A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to

the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.      The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.      Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.      A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.      The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a

9

subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.     The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983.   Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.     The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.     The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.     The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**ENFORCEMENT**

**Paragraph Fifteen.**  The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

**Paragraph Sixteen.**   The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character.  The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages.  In recognition of the foregoing, the Executive agrees that:

A.     In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B.     In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive

("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C.    In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

**Paragraph Seventeen.**   This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Paragraph Eighteen.**   The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render such provision valid, legal and enforceable.  It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

**Paragraph Nineteen.**   The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder.  The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraphs shall

be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction.  It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraphs for the full time periods specified therein.

## MISCELLANEOUS

**Paragraph Twenty.**  Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed.  Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect.  Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.**  This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. This Agreement may be enforced by any entity that is a subsidiary, division, affiliate or related company of Arthur J. Gallagher & Co. that actually employs Executive.  The initial such employer shall be Arthur J. Gallagher & Co. Insurance Brokers of California, Inc.

**Paragraph Twenty-Two.**  As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement,  that they have executed this Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

**THE EXECUTIVE**

**ARTHUR J. GALLAGHER & CO.**

Attest:

# EXHIBIT D

## EMPLOYEE AGREEMENT
### (California)

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between _____ (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Itasca, Illinois ("AJG") and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

## RECITALS

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**     **Employment.**

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below. The parties agree that Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**     **Duties.**

A.     Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee agrees to comply with all Company policies and procedures in effect and applicable to him. Employee will not, either during or outside normal business hours, directly or indirectly, sell, solicit, service, or manage insurance business, or engage in any aspect of the insurance business for or on behalf of any person or entity other than the Company, nor engage in any activity inimical to the best interests of the Company.

B.     Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and information and trade secrets of the Company, which are not known either to its competitors or within the insurance agency, consulting and brokerage business generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques;

investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services; underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; highly sensitive information about the Company's agreements and relationships with certain underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates relating to Company accounts; premium amounts relating to Company accounts; commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; personnel and payroll data including details of salary, bonus, commission and other compensation arrangements (including those of Employee); and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee recognizes and agrees that part of his duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

       C.      The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess, including, but not limited to, Confidential Information, including Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing his sales, management and/or servicing duties.

       D.      Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee will be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. Employee acknowledges and understands that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, although Employee acknowledges and understands that certain of the Company's accounts may develop an identification with Employee rather than the Company itself, all such accounts will at all times be Company accounts for all purposes and Employee disclaims any interest in any such Company accounts.

**Section 3.      Compensation and Benefits.**

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's headquarters, which is incorporated herein by the reference for purposes of evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled to as of the Effective Date of this Agreement is noted in Employee's official personnel file and records. The compensation and benefits to which Employee is entitled is subject to periodic change at the Company's discretion.

**Section 4.      Representations.**

Employee represents and warrants to the Company that:

A.      He is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.      Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.      His employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.      He has not misused, and will not misuse, any confidential or proprietary information he has obtained from any prior employer or any other person or entity;

E.      He has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.      He is in compliance with any valid non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance.

**Section 5.      Termination of Employment Relationship.**

A.      The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); or (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies.

B.      The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. The parties understand and agree that once the Notice Period expires, the Employee's entitlement to such compensation and benefits ends.

C.      Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts for which he has been most recently responsible. Employee further agrees that, during the Notice Period (whether or not active employment responsibilities continue during the Notice Period), Employee's duties to the Company, including Employee's fiduciary duty, will remain in effect. Employee agrees that, prior to the expiration of the Notice Period, he will return to the Company all originals and hard copies of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that Employee will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in

any meeting the Company may convene to: (i) review the status of any projects or work to which Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee clearly understands the nature and scope of his post-employment obligations.

D.      As of the effective date of termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

E.      Before commencing any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and provide it with a copy of this Agreement.

F.      During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

G.      Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.      The Company's Right to Injunctive Relief; Attorneys' Fees.**

Employee acknowledges that Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should he breach or threaten to breach his post-employment obligations under this Agreement. Employee also acknowledges that it would be too difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement, that injury to the Company from any such breach would be incalculable and irremediable, and that money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy which the Company may have at law or in equity, the Company will be entitled to enforce this Agreement and will be entitled to a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable harm to the Company. In addition, Employee agrees that the Company will have the right to seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. The prevailing party will be entitled to its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any and all amounts of any kind that may then be owing or payable by the Company to Employee pursuant to this Agreement or otherwise.

**Section 7.**      **Trade Secrets and Confidential Information.**

 A. Employee acknowledges that the Company's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of the Company's business requires that this information remain proprietary to the Company. Accordingly:

 (1) Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is work for hire performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute work for hire, or if any rights in any such intellectual property do not accrue to the Company as a work for hire, Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all of his respective copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

 (2) Employee has been notified by the Company, and understands, that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

 B. Employee recognizes the highly sensitive nature of the Confidential Information he will be given and to which he will have access during his employment with the Company, and acknowledges the Company's legitimate interest in safeguarding such from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that (i) after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another, and (ii) for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another. Employee and the Company agree and acknowledge that not all of the Confidential Information will rise to the level of a trade secret of the Company, but nonetheless, all Confidential Information will be entitled to the protections and restrictions provided herein.

 C. Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information and but for his agreements not to divulge such Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that any breach by him of the restrictions provided in Section 8 below would inevitably and necessarily lead to the prohibited disclosure and/or use of Confidential Information.

**Section 8.**      **Protection of the Company's Confidential Information and Protectable Interests.**

 In order to protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, relationships with Company accounts, employment relationships and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company, which Employee did not previously have and to enforce Employee's promise not to disclose such Confidential Information, Employee hereby agrees that:

 A. During the period of Employee's employment with the Company, Employee will not directly or indirectly use, misuse, appropriate or disclose Confidential Information of the Company;

 B. Employee will never directly or indirectly use, misuse, appropriate or disclose Confidential Information that constitutes a trade secret of the Company for any purpose whatsoever, including, but not limited to, for the purpose of diverting business away from the Company and to Employee's own benefit or that of another;

C.      For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly use, misuse, appropriate or disclose Confidential Information that does not rise to the level of a trade secret of the Company for any purpose whatsoever, including, but not limited to, soliciting any person, company or entity to purchase products or services competitive with or similar to products or services offered by, designed by or distributed by Company, if that person, company or entity was a Company customer for such products or services with which Employee had direct contact and about which Employee learned Confidential Information related to providing those products or services at any time during the last two (2) years of Employee's employment with the Company.

D.      Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly solicit, induce or recruit any employee of the Company to leave the employ of the Company. In addition, Employee will not directly or indirectly solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company;

E.      If, within two (2) years of the termination of Employee's employment with the Company for any reason, Employee will engage in, or join a company or business enterprise that is engaged in providing insurance and/or benefits services similar to those offered by the Company, then in such event, Employee agrees that the Company may advise any of its current or prospective accounts of the existence and terms of this Agreement and furnish them with a copy of this Agreement; and

F.      If, within two (2) years of the termination of Employee's employment with the Company for any reason, Employee will engage in, or join a company or business enterprise that is engaged in providing insurance and/or benefits services similar to those offered by the Company, then in such event, Employee agrees that the Company may furnish to Employee's new employer a copy of this Agreement.

**Section 9.      Assignment.**

Except as provided in Section 10 hereof, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and this Agreement will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

**Section 10.      Release of Certain Obligations.**

Notwithstanding anything contained herein to the contrary, the obligations of Employee contained in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to this Section 10:

A.      The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.      The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)     A Business Combination, unless:

a)      the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)      the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)      the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)      all of the following conditions are satisfied:

I.      The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

i)      the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

ii)     an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

iii)    an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date s customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections i), ii) and iii) for recapitalizations and for stock splits, stock dividends, and like distributions; and

II.     A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

(2)     The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3)     Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4)     A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.     The term "<u>Business Combination</u>" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.     The term "<u>Related Person</u>" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

E.     The term "<u>Substantial Part</u>" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.     The term "<u>other consideration to be received</u>" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.     The term "<u>Continuing Director</u>" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "<u>Outside Director</u>" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.     <u>General.</u>**

A.     The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision will govern.

B.     This Agreement is made in and will be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of law principles.

C.     If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the

Effective Date and is subject to any existing employment agreement with the acquired business enterprise, then this Agreement will be considered an Amended and Restated Employment Agreement if Employee's employment agreement with the acquired business enterprise is assigned to the Company.

D. This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

E. Subject to Section 10(F) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

F. To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date (the "Acquired Business"), then the term the "Company" shall be deemed to include the Acquired Business.

G. All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, will be addressed to it or delivered to it at its principal office for the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or will be addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

H. The use of the male gender in this Agreement includes the female gender. The words "including" or "include" will not be interpreted as terms of limitation or exclusion.

I. This Agreement may be executed in counterparts, each of which will be deemed an original copy.

*(Remainder of page left intentionally blank – signature page follows)*

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement shall be _____.

**ARTHUR J. GALLAGHER & CO.,**
on behalf of itself and its subsidiaries, divisions
and affiliated and related companies

**EMPLOYEE**

By: _____
     Corporate Officer Signature – Itasca

_____
Employee Signature

Assistant Secretary & Senior Counsel
Title

_____
Printed Name

_____
Date

_____
Date

FOR PAYROLL USE ONLY:

Employee ID:_____