RILEY SAFER HOLMES & CANCILA LLP
Ronald S. Safer (admitted *pro hac vice*)
Harnaik Kahlon (admitted *pro hac vice*)
Meghan R. McMeel (SBN 284841)
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:      415-275-8550
Facsimile:      415-275-8551
rsafer@rshc-law.com
nkahlon@rshc-law.com
mmcmeel@rshc-law.com

HOLLAND & KNIGHT LLP
Sarah A. Marsey (SBN 297911)
Alex Hadduck (SBN 312962)
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone:   415-743-6900
Facsimile:   415-743-6910
sarah.marsey@hklaw.com
alex.hadduck@hklaw.com

Attorneys for Plaintiff
ARTHUR J. GALLAGHER & CO.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., a Delaware Corporation, | )<br>)<br>)<br>) | CASE NO.: 20-cv-05505-EMC |
| Plaintiff, | )<br>)<br>) | **PLAINTIFF ARTHUR J. GALLAGHER & CO.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | )<br>)<br>)<br>) | |
| DON TARANTINO, an individual, BERNADETTE HEATER, an individual, MICHAEL MACHETTE, an individual, and SPENCER BRUSH, an individual, | )<br>)<br>)<br>)<br>) | Hearing: April 28, 2022<br>Time:    1:30 pm<br>Ctrm:    5<br>Judge:   Judge Edward M. Chen |
| Defendants. | )<br>)<br>) | |
| | )<br>) | Complaint Filed:  August 7, 2020 |

1

## **TABLE OF CONTENTS**

2
INTRODUCTION ................................................................................................................1

3
LEGAL STANDARD.........................................................................................................2

ARGUMENT ......................................................................................................................3

4
I.     SUMMARY JUDGMENT ON GALLAGHER'S BREACH OF FIDUCIARY
CLAIMS AGAINST MACHETTE AND TARANTINO SHOULD BE DENIED
5
BECAUSE THERE IS EVIDENTIARY SUPPORT FOR GALLAGHER'S
CLAIM................................................................................................................3
6
      A.    Tarantino and Machette Owed Gallagher Fiduciary Duties ....................3
7
      B.    There Is an Issue of Fact as to Whether Tarantino and Machette Breached
8
the Fiduciary Duties Owed to Gallagher ...................................................5

9
II.    GALLAGHER HAS AMPLE EVIDENCE OF TARANTINO'S USE OF
GALLAGHER'S TRADE SECRETS .........................................................................9
10
      A.    Tarantino is Liable for Misappropriation Even if He Did Not Directly
11
Steal Gallagher's Trade Secrets .............................................................10

12
      B.    There is Ample Evidence that Tarantino Used Gallagher's Trade Secrets ..........10
13
        1.    Heater Took Gallagher's Trade Secrets and Used Them to Poach Gallagher's
Clients ..........................................................................................11
14
        2.    Strong Circumstantial Evidence Shows that Heater's Misappropriations Were
Done at Tarantino's Behest, and Tarantino Clearly Benefitted from the
15
Misappropriations ........................................................................14
16
        3.    Tarantino is Liable for Using Gallagher's Trade Secrets Through Heater ................16
III.   CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS IS A LEGALLY
17
COGNIZABLE THEORY OF LIABILITY .....................................................16

18
IV.   PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE
THERE IS EVIDENTIARY SUPPORT FOR GALLAGHER'S BREACH OF
19
CONTRACT CLAIM ........................................................................................18

20
V.    GALLAGHER'S NON-TRADE SECRET CLAIMS ARE NOT PREEMPTED
BECAUSE THEY INVOLVE FACTS DISTINCT FROM ITS TRADE SECRET
CLAIMS .............................................................................................................20
21
      A.    Gallagher's Breach of Fiduciary Duty Claim Is Not Preempted by the
22
CUTSA ...................................................................................................22

23
      B.    Gallagher's Intentional Interference Claim Is Not Preempted by the
CUTSA ...................................................................................................23
24
      C.    Gallagher's Unfair Competition Claim Is Not Preempted by the CUTSA...........24
25
      D.    Gallagher's Non-Trade Secret Claims Are Not Preempted Simply Because
Preceding Allegations in the SAC Are Incorporated Therein .................25
26
CONCLUSION...................................................................................................................25
27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**FEDERAL CASES**

4

5
*Advanced BioTech, LLC v. BioWorld USA, Inc.*,
2020 WL 5797929 (E.D. Cal. 2020) ...................................................................................14

6
*Alcalde v. NAC Real Estate Inv.*,
2007 WL 9712047 (C.D. Cal. Jan. 5, 2007).........................................................................4

7

*Ambat v. City & County of San Francisco*,
8
757 F.3d 1017 (9th Cir. 2014) ..............................................................................................3

9
*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................................................3

10
*ATS Prods Inc. v. Ghiorso*,
11
2012 WL 253315 (N.D. Cal. Jan. 26, 2012) ........................................................................8

12
*ATS Products, Inc. v. Champion Fiberglass*, Inc.,
2015 WL 224815 (N.D. Cal. Jan. 15, 2015) ......................................................................13

13
*Cardinal v. Lupo*,
14
2019 WL 4450859 (N.D. Cal. Sept. 17, 2019).....................................................................8

15
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................................................................2

16
*ChromaDex, Inc. v. Elysium Health, Inc.*,
17
69 F. Supp. 3d 983 (C.D. Cal. 2019).....................................................................................5

18
*Codexis, Inc. v. Enzymeworks, Inc.*,
2016 WL 4241909 (N.D. Cal. Aug. 11, 2016) ...................................................................10

19
*Copart, Inc. v. Sparta Consulting, Inc.*,
20
277 F. Supp. 3d 1127 (E.D. Cal. 2017) ...........................................................................3, 10

21
*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,
2014 WL 466274 (E.D. Cal. Feb. 5, 2014) ............................................................11, 12, 13

22
*GSI Tech., Inc. v. United Memories Inc.*,
23
2015 WL 5655092 (N.D. Cal. Sept. 25, 2015) ..................................................................20

24
*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
556 F. Supp. 2d 1122 (E.D. Cal. Apr. 11, 2008)......................................................13, 17, 18

25
*Henry Shein, Inc. v. Cook*,
26
2017 WL 783617 (N.D. Cal. Mar. 1, 2017). ...................................................3, 8, 9, 10, 11

27
*Hiossen, Inc. v. Kim*,
2016 WL 10987365 (C.D. Cal. Aug. 17, 2016) .................................................................22

28

---

*Kovesdy v. Kovedsy*,
2010 WL 3619826 (N.D. Cal. Sept. 13, 2010)..................................................................11

*Language Line Servs. v. Language Servs. Assocs.*,
944 F. Supp. 2d 775 (N.D. Cal. 2013) ............................................................................15

*IDX Tech., Inc. v. Aspen Elecs. Inc.*,
2001 WL 1382758 (Cal. Ct. App. Nov 7, 2001) ..............................................................21

*MedImpact Healthcare Sys., Inc. v. IQVIA Inc.*,
2020 WL 5064253 (S.D. Cal. Aug. 27, 2020)...............................................................4, 13

*Monolithic Power Sys., Inc. v. Dong*,
2021 WL 4522291 (N.D. Cal. June 22, 2021) ...............................................................11

*Navigation Holdings, LLC v. Molavi*,
445 F. Supp. 3d 69 (N.D. Cal. 2020)...............................................................................9

*Nelson Bros. Prof. Real Estate LLC v. Jaussi*,
2017 WL 8220703 (C.D. Cal. Mar. 23, 2017) .........................................................8, 9, 13

*NW Monitoring LLC v. Hollander*,
534 F. Supp. 3d 1329 (W.D. Wa. 2021) ..........................................................................12

*Robert Half Int'l, Inc. v. Ainsworth*,
68 F. Supp. 3d 1178 (S.D. Cal. 2014) ............................................................................8, 9

*Scott v. Harris*
550 U.S. 372 (2007) ........................................................................................................2

*Silicon Image, Inc. v. Analogix Semiconductor*,
642 F. Supp. 2d 957 (N.D. Cal. 2008)............................................................................20

*SMC Networks, Inc. v. Hitron Techs. Inc.*,
2013 WL 12114104 (C.D. Cal. Nov. 13, 2013) ...............................................................9

*Steinbert Moorad & Dunn, Inc. v. Dunn*,
2002 WL 31968234 (C.D. Cal. Dec. 26, 2002) ...............................................................14

*SunPower Corp. v. SolarCity Corp.*,
2012 WL 6160472 (N.D. Cal. Dec. 11, 2012) ...............................................................11

*Taylor v. First Advantage Background Serv. Corp.* ...................................................................3
207 F. Supp. 3d 1095 (N.D. Cal. 2016)

*Thomas Weisel Partners LLC v. BNP Paribas*,
2010 WL 1267744 (N.D. Cal. Apr. 10, 2010)...............................................20, 21, 22, 23

*VBS Distrib. v. Nutrivita Labs, Inc.*,
2020 WL 6259999 (E.D. Cal. Sept. 28, 2020) .................................................................15

*VBS Distrib., Inc. v. Nutrivita Labs., Inc.*,
2020 WL 6259999 (C.D. Cal. Sept. 28, 2020) ................................................................12

*Weride Corp. v. Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019)...................................................................21

*Western Air Charter, Inc. v. Schembari*,
   2017 WL 10638759, at *3 (C.D. Cal. Oct. 6, 2017) ................................................9

*Wixen Music UK Ltd. v. Transparence Entm't Grp., Inc.*,
   2021 WL 6065690, at *9 (C.D. Cal. Dec. 22, 2021).........................................11, 13

*Zayo Grp v. Hisa*,
   2013 WL 12201401 (C.D. Cal. Sept. 17, 2013) ..................................................8, 11

*Zomm, LLC v. Apple Inc.*,
   391 F. Supp. 3d 946 (N.D. Cal. 2019)....................................................................4


**STATE CASES**

*Angelica Textile Servs., Inc. v. Park*,
   220 Cal.App.4th 495 (2013)......................................................................................3

*Bancroft-Whitney Co. v. Glen*,
   64 Cal. 2d 327 (1966) ..............................................................................................22

*Cadence Design Sys., Inc v. Avant! Corp.*,
   29 Cal. 4th 215, 222 (2002).....................................................................................13

*GAB Bus. Servs. v. Lindsey & Newsom Claim Servs.*,
   83 Cal. App. 4th 409 (2000)...............................................................................20, 21

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004)............................................................................................20


**STATUTES**

Fed. R. Civ. P. 56(a) ......................................................................................................2

Cal. Bus. Prof. Code § 17200, et seq. ...........................................................................4

Cal. Civil Code § 3426..................................................................................................14

# INTRODUCTION

The evidence in Gallagher's Opposition herein shows that Defendants Tarantino and Machette, as the undisputed leaders of the teams that serviced their lucrative books of business at Gallagher, worked with Gallagher's competitor, Alliant—while still employed at Gallagher—to facilitate the poaching of Gallagher's employees and clients.  Defendant Heater (a long-time associate of Tarantino who has followed him through multiple sales of his brokerage business), Defendant Machette, and Defendant Brush (Machette's son-in-law) emailed highly confidential and valuable compilations of Gallagher's client information to their personal email accounts in the weeks leading up to their abrupt resignations.  Heater admits to using this information to solicit Gallagher's clients Tarantino sold to and serviced while at Gallagher to switch to Alliant. Machette and Brush used information that each admits he has no explanation for possessing other than having obtained it from Gallagher.  These actions were in violation of each of the Defendants' respective employment agreements with Gallagher, and furthermore constituted a breach of the fiduciary duty that Tarantino and Machette each owed to Gallagher.

Defendants' present motion seeks partial summary judgment on each of Gallagher's causes of action (the "Motion"), and is largely a rehash of legal issues this Court has already ruled on in granting in part and denying in part Defendants' prior Rule 12(b)(6) motion (*see* ECF No. 32 (the "MTD Order")).

The factual issues are many, and Gallagher's legal theories are well-established under Ninth Circuit and California law.  For the reasons discussed more fully below, Defendants' Motion should be denied in its entirety because:

1.      There are ample facts from which a jury could conclude Defendants Tarantino and Machette—who each managed a large team of Gallagher employees responsible for servicing Gallagher's clients (many of whom moved their businesses to Alliant after their departures)—owed fiduciary duties to Gallagher, precluding partial summary judgment on Gallagher's Fourth Cause of Action (breach of fiduciary duty).

2.      There is also ample evidence Defendants Tarantino and Machette breached their fiduciary duties to Gallagher by working with Alliant to poach key members of their respective

1   teams while still working for Gallagher, further precluding partial summary judgment on

2   Gallagher's Fourth Cause of Action.

3        3.    There is ample evidence in support of Gallagher's allegation that Defendant

4   Tarantino, through his close and longtime assistant Heater, used Gallagher's trade secrets, which

5   makes summary judgment in favor of Defendant Tarantino on Gallagher's Second

6   (misappropriation under DTSA) and Third (misappropriation under CUTSA) Causes of Action

7   inappropriate.

8        4.    Gallagher's claim that Defendants conspired to misappropriate trade secrets under

9   the Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA")

10   is recognized under California and Ninth Circuit law, and Defendants' out-of-Circuit and inapposite

11   caselaw to the contrary must be ignored.  Gallagher's conspiracy allegations therefore stand as a

12   matter of law.

13        5.    The evidence that each of the four Defendants took confidential Gallagher

14   information explicitly prohibited by their respective employment agreements requires that

15   Defendants' Motion be denied with respect to the First Cause of Action (breach of contract).

16        6.    Gallagher's Fourth (breach of fiduciary duty), Fifth (intentional interference with

17   prospective economic advantage), and Sixth Causes of Action (unfair business practices) allege

18   facts separate and independent from its trade secret misappropriation claims, so they are not

19   preempted by California's trade secret law, and Defendants have not otherwise shown Gallagher's

20   allegations are insufficient as a matter of law or that there is no triable material fact with respect to

21   these causes of action.  Gallagher's Fourth, Fifth, and Sixth Causes of Action therefore stand as a

22   matter of law.

23   **<u>LEGAL STANDARD</u>**

24        Summary judgment is appropriate only if there is no genuine dispute as to any material fact

25   and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party

26   bears the burden of establishing the absence of a genuine issue of material fact, *see Celotex Corp. v.*

27   *Catrett*, 477 U.S. 317, 322-23 (1986), and the court is to draw all inferences and views all evidence

28   in the light most favorable to the non-moving party.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007)

(citation omitted).  Only if the movant has made this showing does the burden then shift to the non-moving party to identify "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 323.  A "genuine issue" exists if "sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Because summary judgment "is a 'drastic device,' cutting off a party's right to present its case to a jury, the Supreme Court has "taken care to note that district courts should 'act with caution in granting summary judgment,' and have the authority to 'deny summary judgment in a case where there is a reason to believe the better course would be to proceed to a full trial." *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1141 (E.D. Cal. 2017) (citation omitted).

## ARGUMENT

## I. SUMMARY JUDGMENT ON GALLAGHER'S BREACH OF FIDUCIARY CLAIMS AGAINST MACHETTE AND TARANTINO SHOULD BE DENIED BECAUSE THERE IS EVIDENTIARY SUPPORT FOR GALLAGHER'S CLAIM

### A.    Tarantino and Machette Owed Gallagher Fiduciary Duties

Whether Tarantino or Machette participated in the management of Gallagher or exercised some discretionary authority on Gallagher's behalf is a question for the fact-finder and Defendants' motion should be denied.  *GAB Bus. Servs. v. Lindsey & Newsom Claim Servs.*, 83 Cal. App. 4th 409, 422 (2000) (emphasis in original)

"[T]he test for fiduciary status is not control; it is, instead, merely ***participation*** in management." *GAB Bus. Servs. v. Lindsey & Newsom Claim Servs.*, 83 Cal. App. 4th 409, 422 (2000) (emphasis in original) (disapproved of in part on other grounds, *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1154 (2004)).  In other words, "[a] company's fiduciaries are not limited solely to those individuals who exercise top-level control; rather, an officer who . . . exercises some discretionary authority, is a fiduciary of the corporation as a matter of law." *Thomas Weisel Partners LLC v. BNP Paribas*, 2010 WL 1267744, at *5 (N.D. Cal. Apr. 10, 2010) (citations and quotations omitted).  This is a "low threshold," and "'unilateral' actions in areas such as hiring, firing, or signing documents as an officer" are not necessary.  *GAB Bus. Servs.*, 83 Cal. App. 4th at 422. Indeed, California courts have held that "a non-officer who supervised two employees owed fiduciary dut[ies] to [the] employer." *Thomas Weisel*, 2010 WL 1267744, at *6 (describing *IDX*

3

*Tech., Inc. v. Aspen Elecs. Inc.*, 2001 WL 1382758, at *3 (Cal. Ct. App. Nov 7, 2001)).  "Whether a particular officer participates in management is a question of fact" and the California Court of Appeal "expect[s] that in most cases this test will be easily met."  *GAB Bus. Servs.*, 83 Cal. App. 4th at 421.  "[A]s in all legally recognized fiduciary relationships, once this factual prerequisite is established, the law imposes a fiduciary duty."  *Id.*

In *Thomas Weisel* the defendant managed a department, including approximately 50 employees and "exercised at least some control, if not direct authority, over whom to hire and how much to pay them."  2010 WL 1267744, at *6.  The court found that, at the summary judgment stage, this was enough to find that the defendant owed his employers fiduciary duties as a matter of law.  *Id.*  Similarly, the court in *Weride Corp. v. Huang* held that the defendant owed fiduciary duties because he "[led] a team of 10-12 engineers" and had responsibility for the team's budget.  379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019).

Here, there are more than enough facts for a jury to conclude that Tarantino and Machette participated in management at Gallagher, including:

- Gallagher entrusted them to protect its clients under their charge, which included servicing the clients' needs and managing teams of employees hired to service Gallagher's clients.[1]
- They were involved in hiring and firing decisions related to staffing their teams.[2]
- They were in charge of monitoring team performance and working with Gallagher to address performance issues.[3]
- Tarantino has been the Area Chairman of Gallagher's San Francisco operations since 2009 and Gallagher paid him a management fee in addition to his compensation for participating in branch management and steering activities.[4]
- Machette provided his staff with yearly bonuses based on their performance.[5]
- Tarantino unilaterally determined how to structure commission fees with his clients without any approval from Gallagher.[6]

---

[1] McMeel Decl. ¶ 5 & Ex. 4 (Buckley Dep.) at 59:9–60:9, 64:15–18; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 54:9–24; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 29:4–8, 30:21–24; *id.* ¶ 3 & Ex. 2 (Binford Dep.) at 36:7–21, 40:1–9.
[2] McMeel Decl. ¶ 3 & Ex. 2 (Binford Dep.) at 33:21–34:7, 67:12–68:4, 39:12–19; 72:21–73:16; *id.* & Ex. 4 (Buckley Dep.) at 60:12–18; 64:2–7; 65:22–66:5.
[3] McMeel Decl. ¶ 5 & Ex. 4 (Buckley Dep.) at 73:4–80:15, 82:9–84:6, 95:15–98:7; *id.* ¶ 3 & Ex. 2 (Binford Dep.) at 72:21–73:4.
[4] ECF No. 41 (Defs' Answer to SAC) ¶¶ 14–15; McMeel Decl. ¶ 3 & Ex. 2 (Binford Dep.) at 32:12–33:1.
[5] McMeel Decl. ¶ 4 & Ex. 3 (Brush Dep.) at 126:9–127:14; Binford Decl. ¶ 8 & Exs. 59, 60, 61.
[6] Binford Decl. ¶ 7.

4

1

- At Machette's insistence, Gallagher structured a long-term compensation and business strategy for Brush.[7]

2

- Tarantino regularly communicated his frustrations or requests to Tom Gallagher, CEO of Gallagher's Global Brokerage.[8]

3

4

- Tarantino and Machette signed employment offers, on behalf of Gallagher, to candidates applying for jobs at Gallagher.[9]

5

Defendants, however, contend there is no factual issue in dispute because Tarantino and

6

Machette did not have "management authority" at Gallagher, their titles were "ceremonial," they

7

had no part in any strategic decision-making at Gallagher, they could not unilaterally hire, fire, or

8

set salaries for their team members, and neither Defendant reported directly to Gallagher's

9

Chairman or CEO.  (Mot. at 22-24.)  Drawing all inferences and viewing all evidence in the light

10

most favorable to Gallagher, a reasonable jury could return a verdict on these facts in Gallagher's

11

favor and Defendants' motion on this point must be denied.

12

**B.    There Is an Issue of Fact as to Whether Tarantino and Machette Breached the Fiduciary Duties Owed to Gallagher**

13

Defendants argue that, even if Tarantino and Machette owed Gallagher fiduciary duties,

14

"Gallagher lacks evidence that Tarantino or Machette did anything unlawful while still at

15

Gallagher."  (Mot. at 25.)  This is false.

16

"[T]he fiduciary duty is breached when an employee who owes that duty engages in a

17

'consistent course of conduct designed to obtain for a competitor those of plaintiff's employees

18

whom the competitor could afford to employ and would find useful.'"  *Thomas Weisel*, 2010 WL

19

1267744, at *9 (quoting the "seminal case on this issue" *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d

20

327 (1966)).  The *Thomas Weisel* court found a breach of fiduciary duties where the defendant

21

worked with a competitor to "smooth[] the transition process" for the competitor to poach the

22

plaintiff's employees by providing the competitor with salary information, a list of the employees

23

the defendant considered "key," and "serv[ed] as a conduit of information between [the competitor]

24

and the employees."  *Id.*  On those facts, "whether [defendant] technically solicited, encouraged or

25

coerced any of the employees [to leave plaintiff] is irrelevant" because the defendant clearly

26

27

28

[7] McMeel Decl. ¶ 8 & Ex. 7 (Machette Dep.) at 110:1–16; Binford Decl. ¶ 8 & Ex. 56.
[8] McMeel Decl. ¶ 3 & Ex. 2 (Binford Dep.) at 37:3–8; Binford Decl. ¶ 8 & Ex. 75 at 4.
[9] Binford Decl. ¶ 8 & Ex. 66 at 2; *id.* & Ex. 58 at 2.

violated his duty of loyalty.  *Id.*  There is plenty of evidence of similar, but more egregious conduct by Gallagher's former fiduciaries:

### **Machette**

The evidence demonstrates that Machette breached his fiduciary duties to Gallagher by soliciting Gallagher employees (including his son-in-law, Brush) and Gallagher clients.

- While still employed by Gallagher, for months, Machette engaged in protracted negotiations with Gallagher's competitors Brown & Brown, Inc. and Alliant Insurance Services, Inc. on behalf of him and Brush.[10]

- Brown & Brown wanted to buy Machette's book of business from Gallagher "the right way," by approaching and securing a release from Gallagher because Machette owed Gallagher contractual and fiduciary obligations.[11] That deal would have also paid Machette a lucrative sum of guaranteed cash whereas it would have given Brush a guaranteed salary for three years. [12]

- As the deal with Brown & Brown was coming to fruition, Alliant approached Machette with an offer[13] that provided Brush exponentially more guaranteed money than he was making at Gallagher. Alliant's offer did not require Gallagher's acquiescence, and Alliant agreed to provide Machette unlimited indemnification and defense for any claims brought by Gallagher.[14]

- On July 20, 2020, Machette turned down Brown & Brown's offer after a family meeting attended by Brush.[15] In his letter declining Brown & Brown's offer, Machette cites Alliant's willingness to forgo Gallagher's consent, Alliant's indemnification, Brush's happiness as the primary considerations for his decision.[16]

- When Machette turned down the other brokerage firm's offer (in favor of Alliant), he told Brush: "I'm excited about our right decision!!"[17]

- Before Machette resigned from Gallagher, Machette's daughter (Brush's wife) emailed Alliant's Human Resources department the signed employment offer on behalf of Machette.[18]  Machette forwarded that email to Brush, writing: "FYI, all forms sent. Start date, Monday-Thursday TBD tomorrow. Enjoy Jay, he is great"[19]—signaling to Brush

---

[10] McMeel Decl. ¶ 8 & Ex. 7 (Machette Dep.) at 24:16–25:3, 28:8–9, 54:23–56:3, 102:3–10, 136:1–7); *id.* ¶ 27 & Ex. 26.; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 91:4–9, 93:4–94:2, 95:2–17, 97:11–14, 98:5–9, 101:10–102:4, 107:16–109:1.

[11] *Id.* ¶ 8 & Ex. 7 (Machette Dep.) at 58:3–20, 104:4–106:19, 108:3–12, 148:18–149:4; *id.* ¶ 21 & Ex. 20 at 3.

[12] *Id.* ¶ 8 & Ex. 7 (Machette Dep.) at 56:11–14, 58:3–20, 104:4–106:19; *id.* ¶¶ 21, 22 & Exs. 20, 21.

[13] The details of which have never been produced by Defendant Machette, presumptively because he deleted it.  *Id.* ¶ 32 & Ex. 31.

[14] Brown & Brown only offered to indemnify Machette up to $200,000 if he secured Gallagher's agreement, and Machette had to indemnify Brown & Brown if he left Gallagher without its release.  *Id.* ¶ 22 & Ex. 21 at 4.

[15] *Id.* ¶ 8 & Ex. 7 (Machette Dep.) at 143:12–144:3; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 105:7–16, 109:13–111:20); *id.* ¶ 11 & Ex. 10.

[16] *Id.* ¶ 8 & Ex. 7 (Machette Dep., 143:12–144:3 & Ex. 2112); *id.* & Ex. 3 (Brush 106:4–108:6, 112:3–113:4, 114:25–115:23); *id.* ¶ 11 & Ex. 10 at 1.

[17] *Id.* ¶ 51 & Ex. 50 at 1.

[18] *Id.* ¶ 4 & Ex. 3 (Brush Dep.) at 155:20–158:8); *id.* ¶ 13 & Ex. 12 at 1; *id.* ¶ 8 & Ex. 7 (Machette Dep.) at 138:4–139:22.

[19] *Id.*

that he would be following him to Alliant soon, and a discussion between Brush and Jay Fischer (Alliant executive) was imminent.

- Machette and Brush understood and expected that Brush would follow Machette to Alliant.[20]

- Machette and Brush resigned  20 minutes apart on the same day. Immediately after resigning, and in the middle of the COVID-19 shut-down,[21] Brush drove to Alliant's Walnut Creek office to "interview" in person for a job with Alliant.[22]  Brush quickly accepted Alliant's job offer, and Brush was soliciting Gallagher's clients to switch from Gallagher to Alliant (using an Alliant email domain) the same day he and Machette resigned from Gallagher.[23]

- The Gallagher clients that Machette serviced quickly issued BORs after he resigned from Gallagher.[24]

**Tarantino**

Tarantino's departure from Gallagher also involved a coordinated process of soliciting Gallagher's employees and clients, in violation of his fiduciary duties to Gallagher.

- More than a year before he resigned from Gallagher, Tarantino worked with an executive search agency to help him find a new job (which ultimately landed him at Alliant).[25] In March, 2019, Tarantino told the search agency that any offer of employment would need include equity and more financial gain for his two sons (Salvatore and Taylor Tarantino, both Gallagher employees at that time)[26]—essentially, Tarantino and his two sons were a package deal.

- Tarantino started negotiations with Alliant on or about April 24, 2019—446 days before he abruptly resigned without any noticed from Gallagher.[27]

- In October 2019, during the early phases of his negotiations, Alliant agreed pay Tarantino in exchange for ████████████████████

- In January 2020, Tarantino made an unprecedented request for the salaries of his entire

[20] McMeel Decl. ¶ 4 & Ex. 3 (Brush Dep.) at 101:10–102:8; *id.* ¶ 8 & Ex. 7 (Machette Dep.) at 55:3–6.
[21] *Id.* ¶ 4 & Ex. 3 (Brush Dep.) at 166:11–24, 193:10–194:7; *id.* ¶ 14 & Ex. 13; *id.* ¶ 8 & Ex. 7 (Machette Dep.) at 83:10–11.
[22] *Id.* ¶ 4 & Ex. 3 (Brush Dep.) at 168:11–169:10.
[23] *Id.* ¶ 4 & Ex. 3 (Brush Dep.) at 169:19–170:5; Binford Decl. ¶ 8 & Ex. 71.
[24] A Broker of Record ("BOR") is a communication from a client to its insurance carriers informing the carriers that the client's policies are being handled by a new broker.  *See, e.g.*, McMeel Decl. ¶¶ 31, 33, 35, 55, 58, 59 & Exs. 30, 32, 34, 76, 80, 81; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 193:10–194:7, 224:8–225:23.
[25] *Id.* ¶ 56 & Ex. 78; *id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 56:21–58:19.
[26] *Id.* ¶ 56 & Ex. 78 at 4.
[27] *Id.* ¶¶ 56, 57 & Exs. 78, 79; *id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 49:4–50:15, 56:21–58:19, 112:9–10.
[28] *Id.* ¶ 37 & Ex. 36 at 2; *id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 83:8–84:8; *id.* ¶ 2 & Ex. 1 (Bennetson Dep.) at 84:13–23.
[29] *Id.* ¶ 2 & Ex. 1 (Bennetson Dep.) at 81:19–82:6; *id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 83:8–84:8; *id.* ¶ 28 & Ex. 27.

team at Gallagher.[30]  Believing that the request was related to his management of Gallagher, Tarantino was given that information.  Around that time, he also signed a "Prospective Employee Departure Protocol" and NDA with Alliant related to his move.[31]

- In June 2020, Tarantino received an offer of employment from Alliant with a start date of July 13, 2020.[32] As further incentive to solicit his Gallagher team, Alliant offered Tarantino ███████████████████████████████████████████████.

- On July 9, 2020, Heater began working on her resume, even though she claims to have had no plans to apply anywhere, she was not exploring any alternative jobs, and she had worked exclusively for Tarantino since 2005.[34]

- Also on July 9, 2020, while California was under mandatory shutdown orders, Alliant Executive Vice-President, Jay Fischer emailed Alliant's front desk and notified her that on Monday, July 13, 2020, Tarantino, his sons, and Heater would be arriving to Alliant's offices in San Francisco. On July 14, 2020, Brian Selna—a Gallagher producer in its San Francisco office—and "maybe more" would be arriving.[35]

- In anticipation of their arrival to Alliant, Fischer directed Alliant employee, David Erice (account executive/team lead)—not a member of Alliant's human resources—to post job openings for Heater and Tarantino's sons.[36]

- Tarantino, his two sons, and Heater abruptly resigned from Gallagher on July 13, 2020—in the exact order listed by Fischer five days before.[37]  Heater's immediate response was to submit her freshly inked resume to Alliant, and she received from Alliant on minutes after submission. Heater and Tarantino's sons were offered jobs at Alliant the same day Tarantino resigned.[38]  Defendant Tarantino was not surprised by members of his team joining him within hours of his own resignation.[39]

- The next day, and in the order Fischer listed, the rest of Tarantino's team resigned from Gallagher and followed him to Alliant.[40] Those departing employees included Brian Selna and John Quinlan—an Employee Benefits producer in Gallagher's San Francisco office.

- Heater and Tarantino's sons knew their job at Alliant was to immediately start poaching Tarantino's clients over to Alliant, and Tarantino periodically checked in for updates.[41]

- The Gallagher clients that Tarantino serviced quickly followed him to Alliant after he

---

[30] Binford Decl. ¶ 8 & Ex. 75 at 4.
[31] McMeel Decl. ¶ 61 & Ex. 83 at 5-6.
[32] Id. ¶ 34 & Ex. 33.
[33] Id. ¶ 62 & Ex. 84.
[34] Id. ¶ 7 & Ex. 6 (Heater Dep.) at 53:21–24, 239:15–18, 242:7–244:6.
[35] Id. ¶ 41 & Ex. 40; id. ¶ 7 & Ex. 6 (Heater Dep.) at 254:19–255:16.
[36] Id. ¶ 6 & Ex. 5 (Fischer Dep.) at 28:15–20, 167:3–168:20.
[37] Binford Decl. ¶ 8 & Ex. 69; McMeel Decl. ¶ 55 & Ex. 77; Binford Decl. ¶ 8 & Ex. 64; Binford Decl. ¶ 8 & Ex. 63.
[38] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 244:18–258:12; id. ¶ 47 & Ex. 46.
[39] Id. ¶ 7 & Ex. 6 (Heater Dep.) at 267:2–6.
[40] Binford Decl. ¶ 8 & Ex. 65 at 3; id. & Ex. 70; Binford Decl. ¶ 8 & Ex. 73 at 2; McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 264:4–265:4; id. ¶ 3 & Ex. 2 (Binford Dep.) at 132:6–18.
[41] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 206:19–209:4, 279:19–280:15.

8

1    resigned from Gallagher.[42]

2    • Thereafter, Alliant immediately began cold-calling the remaining members of
       Tarantino's team at Gallagher with offers of employment with increased income above
3      their Gallagher salaries.[43]

4    A coordinated attack involving mass departures of Machette and Tarantino's teams to join

5    Alliant and the subsequent wave of Gallagher clients that followed them to Alliant shortly

6    thereafter, does not happen overnight or by coincidence—it required concerted efforts of

7    solicitation before Machette and Tarantino resigned from Gallagher.  Tarantino and Machette's

8    conduct as Gallagher employees to benefit Alliant, a direct competitor of Gallagher—was a clear-

9    cut breach of their fiduciary duties.  *See E.D.C. Techs., Inc. v. Seidel*, 216 F. Supp. 3d 1012, 1016

10   (N.D. Cal. 2016) (explaining that "this Court examined Ninth Circuit precedent and the

11   Restatement of Agency, concluding that nothing in the Restatement indicates . . . that ordinary

12   employees have no duty of loyalty.") (quotations and citation omitted); *Cardinal v. Lupo*, No. 18-

13   cv-00272-JCS, 2019 WL 4450859, at *12 (N.D. Cal. Sept. 17, 2019) (denying summary judgment

14   and concluding that "[t]his Court [] follows the majority view that California law recognizes a claim

15   for breach of an employee's duty of loyalty while still employed.").

16   The evidence is overwhelming that Tarantino and Machette were working with Alliant,

17   while still employed at Gallagher, to identify key Gallagher employees and "smooth the transition

18   process" from their employment at Gallagher to Alliant.  That is a breach of their fiduciary duties.

19   *Thomas Weisel*, 2010 WL 1267744, at *9.

20   **II.    GALLAGHER HAS AMPLE EVIDENCE OF TARANTINO'S USE OF
21         GALLAGHER'S TRADE SECRETS**

22   Nowhere in Defendants' Motion do they challenge that Gallagher possesses trade secrets.

23   Nor do Defendants challenge the proposition that Heater, Machette, or Brush misappropriated those

24   trade secrets.  Defendants only assert that "Gallagher lacks evidence establishing Tarantino

25   improperly acquired, disclosed, or used any purported Gallagher trade secrets."  (Mot. at 17.)

26   Defendants are wrong.

27

28
_____
[42] *See, e.g.*, McMeel Decl. ¶¶ 36, 46, 50 & Exs. 35 at 8, 45, 49; Binford Decl. ¶ 8 & Exs. 54, 53.
[43] Binford Decl. ¶ 6.

**A.   Tarantino is Liable for Misappropriation Even if He Did Not Directly Steal Gallagher's Trade Secrets**

Under CUTSA "a misappropriation within the meaning of the UTSA occurs not only at the time of the initial acquisition of the trade secret by wrongful means, but also with each misuse." *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1136 (E.D. Cal. Apr. 11, 2008) (quoting *Cadence Design Sys., Inc v. Avant! Corp.*, 29 Cal. 4th 215, 222 (2002)) (emphasis in original).

Thus, under CUTSA, an individual is liable for trade secret misappropriation even if he or she does not directly take the trade secrets so long as:

(1)   Plaintiff is the owner of a valid trade secret;

(2)   Defendant acquired the trade secret from someone other than Plaintiff and:

   a.   knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or

   b.   knew or had reason to know it was a trade secret without Plaintiff's authorization;

(3)   Plaintiff suffered harm as a direct and proximate result of Defendant's use or disclosure of the trade secret, or, Defendant benefitted from such use or disclosure.

*Id.* (citing Cal. Civil Code § 3426 and *Steinbert Moorad & Dunn, Inc. v. Dunn*, 2002 WL 31968234, at *23-24 (C.D. Cal. Dec. 26, 2002)).  Liability for this type of "indirect" trade secret misappropriation—*i.e.*, using a trade secret without being the individual that originally took it from the plaintiff—is well-established under both CUTSA and the DTSA.  *See id.* (CUTSA); *Adv. BioTech, LLC v. BioWorld USA, Inc.*, 2020 WL 5797929, at *7 (E.D. Cal. 2020) (DTSA and CUTSA).

Here, Defendants only challenge whether Tarantino "improperly acquired, disclosed, or used any purported Gallagher trade secret."  (Mot. at 17.)  He did.

**B.   There is Ample Evidence that Tarantino Used Gallagher's Trade Secrets**

10

1.  Heater Took Gallagher's Trade Secrets and Used Them to Poach Gallagher's Clients[44]

Gallagher accuses Defendants of misappropriating, *inter alia*, "current Gallagher client lists, which include information on the value of the clients' claims over the years, client contacts, internal notes regarding particular clients' expectations and preferences." (SAC ¶ 22.) As an example, one type of trade secret that clearly falls into this category are expiration lists also known as renewal lists.

Client expiration lists are a compilation of information about every client in an insurance broker's book of business.[45] The information on these lists are a detailed breakdown of every insurance policy a client has, the policy's carrier, policy number, description, premium, expiration date, Gallagher's employees assigned to each policy, and Gallagher's fee structure for each client or policy.[46] Under no circumstance would Gallagher permit a departing employee or its competitors to possess these renewal lists, because that contains all information necessary to poach Gallagher's clients.[47]

To effectuate the move of a client from one insurance broker to another, the incoming broker must procure a Broker of Record letter ("BOR") from the client.[48] A BOR is a communication from the client informing each insurance carrier issuing each of its policies that the new broker is handling the client's policies.[49] To effectuate these BORs—*i.e.*, to poach clients—the competitor needs to know at least the following details: the client contact authorized to execute the BOR, the identity of each of the client's insurance carriers, each of the client's policy numbers,

---

[44] Defendants have not challenged the existence of Gallagher's trade secrets in their Motion, nor have they challenged—in any way—Gallagher's trade secret misappropriation claims against Heater, Brush, or Machette. For the purpose of responding to their challenge that Gallagher "lacks evidence establishing Tarantino improperly . . . used any **purported** Gallagher trade secrets" (Mot. at 17 (emphasis added)), it is necessary to explain some of the facts related to Gallagher's trade secrets and Heater's misappropriations thereof. Gallagher offers the following explanation of Heater's trade secret misappropriations as illustrative only and does not intend this to be a full description of the scope of every trade secret the Defendants have misappropriated in this case, as Defendants have not put Gallagher to that task.
[45] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 87:21-88:13, 142:18-24; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 52:10-14; *id.* ¶ 5 & Ex. 4 (Buckley Dep.) at 136:21-137:3; *id.* ¶ 3 & Ex. 2 (Binford Dep.) at 206:17-207:9.
[46] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 87:21-88:13, 142:18-24; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 52:10-14; *id.* ¶ 5& Ex. 4 (Buckley Dep.) at 136:21-137:3; *id.* ¶ 3 & Ex. 2 (Binford Dep.) at 206:17-207:9.
[47] Binford Decl. ¶ 3.
[48] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 278:21-280:3; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 217:8-16.
[49] *Id.*

11

1  and the effective dates of each policy.[50]  All of this information is contained in Gallagher's

2  expiration lists.[51]

3  Moreover, tracking a client's numerous policy details, including upcoming expiration

4  dates—which trigger a multi-month review and analysis period to prepare the necessary

5  documentation for renewing a policy—is a crucial aspect of servicing clients and it serves as one of

6  the primary revenue generators for an insurance brokerage.[52]  Gallagher's expiration lists contain

7  this necessary information.[53]  By having access to these lists, a competitor not only knows which

8  clients to target, but also has all of the information to quickly effectuate a BOR and to seamlessly

9  begin servicing the client once it has been poached, and can expand or place new coverages.[54]

10  These expiration lists are generated by Gallagher's data management system, based on

11  information numerous Gallagher employees input into the system over time as they service

12  clients.[55]  Expiration lists are highly confidential and not shared with anyone outside of each

13  producer's team at Gallagher that handles their clients' policies at issue.[56]  Gallagher carefully

14  protects these expiration lists: employees can only access them after entering a strong password that

15  must be changed every 90 days, employees are required to review their confidentiality obligations

16  annually, Gallagher limits physical access to its offices through card keys, and only certain

17  individuals associated with a client's account can access the expiration lists.[57]  Further, the

18  information in these lists is not publicly available.[58]  These proprietary, secret, and valuable

19  customer information compilations clearly qualify for trade secret protection.  *See, e.g.*, *VBS*

20  *Distrib. v. Nutrivita Labs, Inc.*, 2020 WL 6259999, at *3-4 (E.D. Cal. Sept. 28, 2020) (genuine issue

---

[50] McMeel Decl. ¶ 4 & Ex. 3 (Brush Dep.) at 221:7–12; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 282:17-283:6.
[51] *Id.* ¶ 5 & Ex. 4 (Buckley Dep.) at 136:21–137:3, 192:2–17; *Id.* ¶ 3 & Ex. 2 (Binford Dep.) at 206:17–208:13; *id.*  & Ex. 6 (Heater 184:9–185); *id.* ¶ 15 & Ex. 14; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 144:8–145:20; *id.* ¶ 12 & Ex. 11.
[52] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 87:21–90:22; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 58:21–59:15.
[53] *Id.*
[54] *Id.* ¶ 3 & Ex. 2 (Binford Dep.) at 206:17–208:13; *id.* ¶ 5 & Ex. 4 (Buckley Dep.) at 138:18–139:1, 192:2–17; Binford Decl. ¶ 3; *see also* footnotes 54 and 55, *supra*.
[55] McMeel Decl. ¶ 4 & Ex. 3 (Brush Dep.) at 52:25–53:25; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 77:25–79:5, 87:11–88:13.
[56] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 64:15–65:20, 96:11–14, 98:15–99:7, 119:15–21, 121:1–9; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 61:12–63:8; *id.* ¶ 5 & Ex. 4 (Buckley Dep.) at 181:10–22; *id.* ¶ 3 & Ex. 2 (Binford Dep.) at 213:23–214:13.
[57] *Id.*
[58] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 38:22–40:22, 42:1–10, 196:7–15, 198:11–14, 281:10–19, 293:11–294:13; *id.* ¶ 4 & Ex. 3 (Brush Dep.) at 154:6-15.

12

of material fact that customer list was protectable trade secret when it would allow competitor to more efficiently conduct its sales efforts); *Language Line Servs. v. Language Servs. Assocs.*, 944 F. Supp. 2d 775, 784-85 (N.D. Cal. 2013) (plaintiff owned trade secret when access to customer lists was restricted to certain employees, noting that "[c]ustomer lists presumably . . . have commercial value and thus are appropriate for trade secret protection").

Heater knew the expiration reports were confidential: her employment agreement identified the information contained in the expiration reports as confidential and required her to keep that information secret, and she admits the information in the expiration list was sensitive and not publicly available.[59]  On June 18, 2020, only days after Tarantino received Alliant's offer, Heater sent an expiration list for all policies expiring within one year on all of Tarantino's clients from her Gallagher email account to her personal Comcast email address.[60]

On July 13, 2020, *i.e.*, three weeks later, Heater and Tarantino abruptly resigned from Gallagher.[61]  Heater testified that she understood Tarantino was not permitted to contact clients while at Alliant, so she and his two sons were responsible for contacting Gallagher's clients to notify them that the Tarantino team moved to Alliant and securing BORs from the clients in favor of Alliant.[62] The very next day Heater was poaching clients from Gallagher and offering to fill in the details of their BOR letters for them.[63]  Heater admits that the policy information she needed to effectuate the BORs was contained in the expiration report she emailed to herself.[64]  She ***further admits to printing out and using the expiration report at Alliant***.[65]  Heater cannot explain where she got these client details other than Gallagher's expiration list and similar client information compilations she emailed to herself.[66] Heater further admitted that she only returned the expiration list after this lawsuit was filed.[67]

---

[59] Binford Decl. ¶ 8 & Ex. 64 ¶¶ 5, 13; McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 119:7–21, 196:137–15, 198:11–14, 281:10–19, 293:11–294:13.
[60] Binford Decl. ¶ 8 & Exs. 67, 68
[61] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 244:18–258:12.
[62] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 206:24–208:22.
[63] *Id.* ¶ 19 & Ex. 18 at 1; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 298:16–299:16; *id.* ¶ 20 & Ex. 19 at 2; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 300:13–301:5.
[64] *Id.*
[65] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 121:17–21, 301:11–16.
[66] *Id.* (Heater Dep.) at 290:13–294:13, 299:8–300:4, 301:3–16.
[67] *Id.* (Heater Dep.) at 131:4–133:1.

13

The evidence shows that Heater was also coordinating poaching efforts with Alliant staff and was providing Alliant with client policy details—details she could not recall the origin of.[68] Many of the clients Heater focused on her first few weeks at Alliant—including Back of the House and Basic American, the clients at issue in the description of Heater's poaching activities directly above—moved their business to Alliant.[69]

The only way to have effectuated BORs that quickly would be to use Gallagher's expiration list to quickly fill in all of the necessary client policy details.[70]

2.   <u>Strong Circumstantial Evidence Shows that Heater's Misappropriations Were Done at Tarantino's Behest, and Tarantino Clearly Benefitted from the Misappropriations</u>

The clients that Heater poached were ultimately clients Tarantino was tasked with servicing while at Gallagher, as Tarantino was the lead producer for his team, and was in charge of overseeing and managing his team as they serviced of the book of business.[71]  Starting in 2019 Tarantino began negotiating with Alliant to leave Gallagher.[72]  He ultimately negotiated a lucrative compensation package that ██████████████████████████████████████████████████████ .[73]  Another large chunk of Tarantino's compensation came ████████████████ ██████████████████████████████████████████████ .[74]  In other words, ████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████ .[75]

Strong circumstantial evidence suggests that Tarantino also negotiated a lucrative compensation package for Heater at Alliant—including indemnification and defense for any claims

[68] *Id.* ¶ 18 & Ex. 17 at 1-2; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 289:4–294:9.
[69] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 137:17–138:17, 140:7–13, 288:4–16.
[70] *Id.* ¶ 3 & Ex. 2 (Binford Dep.) at 206:19–208:13; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 293:11–294:22, 294:22–295:19; Binford Decl. ¶ 3; McMeel Decl. ¶ 5 & Ex. 4 (Buckley Dep.) at 192:2–17.
[71] *Id.* ¶ 5 & Ex. 4 (Buckley Dep.) at 64:15–18; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 54:9–24.
[72] *Id.* ¶¶ 57, 61 & Exs. 79, 83; *id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 49:4–50:15, 112:9–10.
[73] *Id.* ¶ 10 & Ex. 9 at 5 (████████████████████████████████████████████); *id.* ¶ 40 & Ex. 39 at Exhibit C ███████████████████████████████████████████████████████████████████████████████████ ; *id.*, Ex. D (████████████████████████████████████████████████████████████████████████████ ; *id.* ¶ 9 & Ex. 8 (Tarantino Dep., 83:8–84:8), *id.* ¶ 2 Ex. 1 (Bennetsen Dep.) at 31:22–32:24, 77:11–25; 84:13–85:23, *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 47:18–22.
[74] *Id.*; *see also id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 67:21–25; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 43:17–44:12, 47:18–22, *id.* ¶ 40 & Ex. 39 at Exhibit A (compensation based on commission)).
[75] *Id.* ¶ 9 & Ex. 8 (Tarantino Dep.) at 67:21–25; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 47:18–22; *id.* ¶ 2 & Ex. 1 (Bennetson Dep.) at 31:22–32:24.

14

1    brought against her by Gallagher.[76]  Heater insists she had no advance warning of Tarantino's

2    resignation, but Alliant knew, the week before Heater resigned, that Heater would be in Alliant's

3    office on the same day Tarantino resigned.[77]  Heater had spent the week prior to her resignation

4    updating her resume, even though she claims to have had no plans to apply anywhere, did not

5    explore any alternative jobs, and did not submit her resume anywhere other than Alliant on the day

6    Tarantino resigned.[78]  Tarantino resigned at 7:02 a.m. on July 13.[79] At 8:40 a.m. Heater had already

7    applied to Alliant, and she was at Alliant's office—in the middle of a pandemic—by 11:04 a.m.[80]

8    She had her job offer at Alliant at 12:57 p.m., which included a $15,000 signing bonus and a hefty

9    raise over her salary at Gallagher.[81]  Heater testified she understood that herself, along with

10   Tarantino's two sons, who also resigned from Gallagher and joined Alliant on July 13, 2020, were

11   in charge of bringing Tarantino's book of business from Gallagher to Alliant.[82]  The next day

12   Heater was poaching clients to Alliant with the aid of the misappropriated expiration list.[83]

13          Tarantino knew that Gallagher's trade secrets, including the expiration list, were

14   confidential: he signed agreements to that effect both at Gallagher and at Alliant.[84]  And every

15   client that Heater successfully poached from Gallagher directly benefitted Tarantino through his

16   recruitment bonuses and the commissions paid for each client when they renewed.[85]

17          In short, Tarantino negotiated with Alliant for over a year to bring his book of business to

18   Gallagher.  He and Alliant knew that Tarantino's two sons and Heater would be joining him at

19   Alliant on the day of his resignation.  Heater understood that it was her job to poach Tarantino's

20   clients over to Alliant, which she began doing immediately after her arrival at Alliant by using

21   Gallagher's trade secrets, including the expiration report Heater admits to printing and using at

22

23

24   _____
     [76] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 170:2-172:17.
25   [77] *Id.* ¶ 41 & Ex. 40 at 1; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 254:19–255:16.
     [78] *Id.* ¶ 7 & Ex. 6 (Heater Dep.) at 239:15–18, 242:7-243:23; *id.* ¶¶ 16-17 & Exs. 15-16.
26   [79] Binford Decl. ¶ 8 & Ex. 69.
     [80] McMeel Decl. ¶ 43 & Ex. 42; *id.* ¶ 7 & Ex. 6 (Heater Dep.) at 252:4–253:12; *id.* ¶ 53 & Ex. 52.
27   [81] *Id.* ¶ 42 & Ex. 41 at 3, Ex. 47; Binford Decl. ¶ 8 & Ex. 72; McMeel Decl. ¶ 49 & Ex. 48
     [82] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 206:19–209:4, 265:14–266:20, 279:19–280:15.
28   [83] Section II.B and the paragraphs directly above.
     [84] McMeel Decl. ¶¶ 39, 40 & Exs. 38, 39.
     [85] *See* paragraphs directly above.

                                                    15

1    Alliant.  Tarantino was compensated handsomely for the poaching Heater did for him, and

2    Gallagher lost clients as a result of this poaching.

3                    3.      Tarantino is Liable for Using Gallagher's Trade Secrets Through Heater

4           On the facts above there is a genuine issue of material fact as to whether Tarantino used

5    Gallagher's trade secrets.  This case is analogous to *Hanger Prosthetics*.  There, the evidence

6    suggested that plaintiff's employee, Kimzey, misappropriated trade secrets, in the form of patient

7    (*i.e.*, client) information and used them to solicit clients to the plaintiff's competitor, Capstone.  556

8    F. Supp. 2d at 1126-29, 1136.  Capstone, and its CEO Ellis, argued that they could not be liable for

9    trade secret misappropriation because they did not directly take the alleged trade secrets, and

10   instead only worked with clients after they had been poached from the plaintiff.  *Id.* at 1136.  The

11   court rejected this argument, citing the indirect trade secret misappropriation standard set forth

12   above, and noted that "a jury could reasonably infer that Kimzey was acting as Capstone's agent

13   when he acquired [plaintiff's] patient files, and that Ellis knew of and ratified Kimzey's acquisition

14   and use of patient files."  *Id.* at 1137.

15          Here, the evidence permits a reasonable inference that Tarantino planned for Heater to join

16   him at Alliant and planned for Heater to poach clients to Alliant with Gallagher's trade secrets for

17   Tarantino's benefit.  A jury could therefore reasonably infer that Heater was acting as Tarantino's

18   agent in misappropriating Gallagher's trade secrets and that Tarantino knew of and ratified those

19   misappropriations.  Summary judgment in Tarantino's favor is therefore inappropriate.  *Hanger*

20   *Prosthetics*, 556 F. Supp. 2d at 1137.

21   **III.    CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS IS A LEGALLY**
     **COGNIZABLE THEORY OF LIABILITY**
22

23          Gallagher's SAC seeks to hold Defendants jointly liable for each other's torts against

24   Gallagher as co-conspirators—a pleading the Court explicitly permitted in its Order regarding

     Defendants' Motion to Dismiss.  (MTD Order at 26; SAC, Prayer for Relief § H.)  Defendants
25
     assert that "[a]s a matter of law, Gallagher's conspiracy allegations are invalid" as they relate to
26
     Gallagher's trade secret claims.  (Mot. at 15.)  Defendants are wrong.
27
            Conspiracy to misappropriate trade secrets is a viable theory of liability in this Circuit.  In
28
     *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, 2014 WL 466274, at *3-4 (E.D. Cal. Feb. 5, 2014),

                                                      16

1   for instance, the court held that a civil conspiracy claim for trade secret misappropriation was not

2   preempted by CUTSA and was adequately pleaded because the plaintiff showed how each

3   defendant participated in forming and operating the conspiracy, what each defendant did to further

4   the conspiracy's aims, and the damages the plaintiff suffered as a result.  And in *Wixen Music UK*

5   *Ltd. v. Transparence Entm't Grp., Inc.*, 2021 WL 6065690, at *9 (C.D. Cal. Dec. 22, 2021), the

6   plaintiff "alleg[ed] that [co-conspirators] intentionally recruited [defendant] to share [plaintiff's]

7   trade secrets because [co-conspirators] knew she worked for [plaintiff]."  *Id.*  The court held that

8   these allegations "sufficiently allege[d] conspiracy claims with respect to the two remaining trade

9   secret misappropriation claims."  *Id.*  The trade secret claims in *Wixen* were brought under both the

10   DTSA and CUTSA.  *Id.* at *6.

11         Here, Gallagher's pleading satisfies the test set forth in *Farmers Ins.* and *Wixen*.  The SAC

12   explains how Tarantino and Machette were producers at Gallagher in charge of servicing large and

13   lucrative books of business.  (SAC ¶¶ 1, 8-16.)  It alleges that Heater (a long-time work colleague

14   of Tarantino who has followed him through multiple sales of his book of clients) and Brush

15   (Machette's son-in-law) misappropriated Gallagher's sensitive and confidential information by

16   emailing it to their personal email accounts in the weeks leading up to their abrupt resignations.  (*Id.*

17   ¶¶ 21-24.)  It alleges that the Defendants then used the misappropriated information to solicit

18   Gallagher's clients immediately upon their move to Alliant.  (*Id.* ¶¶ 28-37, 60-61, 72-73.)  It alleges

19   that Heater and Brush misappropriated Gallagher's information and poached Gallagher's clients

20   because Tarantino and Machette had planned for them to join Alliant.  (*Id.* ¶¶ 1-6, 17-20, 63, 75.)  It

21   alleges that Tarantino and Machette's compensation deals at Alliant required them to perpetrate this

22   poaching in exchange for a handsome payout.  (*Id.*)

23         The result is that, in an approximately three-week period following the Defendants'

24   resignations, Gallagher lost over fifty clients and a total of fifteen employees.  (*Id.* ¶ 37.)  Holding

25   the Defendants jointly liable for the trade secret misappropriations that took place in aid of their

26   common plan is therefore appropriate as a matter of law.  *Farmers*, 2014 WL 466274, at *3-4;

27   *Wixen*, 2021 WL 6065690, at *9.

28         Defendant's DTSA cases on this issue are from other Circuits, and are clearly contradicted

17

by the above in-Circuit case law.  (Mot. at 15 n. 23 (citing DTSA cases from the District of Colombia, Kentucky, and Virginia.).)[86]  Defendants' cases regarding CUTSA merely stand for the proposition that conspiracy is not a stand-alone cause of action, and that CUTSA preemption may be appropriate when there is a perfect overlap between the conspiracy allegations and the trade secret allegations.  *See, e.g.*, *VBS Distrib., Inc. v. Nutrivita Labs., Inc.*, 2020 WL 6259999, at *5 (C.D. Cal. Sept. 28, 2020) ("plaintiffs have not alleged any facts differentiating their civil-conspiracy claim from their other claims"); *Nelson Bros. Prof. Real Estate LLC v. Jaussi*, 2017 WL 8220703, at *8 (C.D. Cal. Mar. 23, 2017) (similar); *ATS Products, Inc. v. Champion Fiberglass, Inc.*, 2015 WL 224815, at *1 (N.D. Cal. Jan. 15, 2015) (similar).  Further, as with Defendants' DTSA case, their CUTSA cases are plainly contradicted by *Farmers* and *Wixen*.

Here, Gallagher has not brought conspiracy as a stand-alone cause of action and, like in *Farmers Ins.*, has alleged additional facts that are not necessary to its CUTSA claim—namely an *agreement* among the Defendants to misappropriate Gallagher's trade secrets in order to poach Gallagher's clients and employees to secure a lucrative payout at Alliant—which makes conspiracy liability appropriate here.  *Farmers*, 2014 WL 466274, at *3-4; *Wixen*, 2021 WL 6065690, at *9.[87]

## IV.   PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS EVIDENTIARY SUPPORT FOR GALLAGHER'S BREACH OF CONTRACT CLAIM

Defendants argue that Gallagher cannot establish the element of breach; however, there is evidentiary support to establish that Defendants breached their respective employment agreements with Gallagher such that  partial summary judgment should be denied as to Plaintiff's First Cause of Action (breach of contract).  *See Elation Systems, Inc. v. Fenn Bridge, LLC,* 71 Cal.App.5th 958, 966 (2021) (holding that breach of confidentiality provision in contract "is, in itself, a legal wrong that is fully distinct from the actual damages" and the aggrieved party is entitled to nominal

---

[86] The only exception, *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1338-39 (W.D. Wa. 2021), noted that "definitive answers are lacking" on the issue of conspiracy liability under the DTSA, and merely noted that some cases have held that there is not a ***cause of action*** for conspiracy under the DTSA.

[87] Defendants have not challenged the legal sufficiency of Gallagher's conspiracy claims premised on Defendants' non-trade secret torts, such as breaches of Defendants' fiduciary duties of loyalty to Gallagher. Thus Gallagher's conspiracy claims must survive at least to this extent.  *See, e.g.*, *Medimpact Healthcare Sys. v. IQVIA Inc.*, 2020 WL 5064253, at *21 (S.D. Cal. Aug. 27, 2020) (denying motion to dismiss conspiracy claim on CUTSA preemption grounds when "there are facts alleged as to breach of fiduciary duty that could plausibly form an independent basis for a claim"); *see also* MTD Order at 23.

1    damages).

2        *First*, each Defendant executed employment agreements with Gallagher, assenting to the

3    terms and conditions therein, including a confidentiality provision that provides, in relevant part,

4    that by virtue of their employment with Gallagher, Defendants would be granted otherwise

5    prohibited access to confidential and proprietary data that is not publicly available (defined as

6    "Confidential Information"), including but not limited to:

7            . . . *lists of prospects* . . . the *identity, authority and responsibilities of key contacts*
             at [Gallagher] accounts . . . the *composition and organization of [Gallagher]*
8            *accounts' businesses*; . . . *highly sensitive details* concerning the structure,
             conditions, and extent of [Gallagher accounts'] existing insurance coverages; *policy*
9            *expiration dates*; *premium amounts*; *commission rates*; risk management service
             arrangements; *loss histories* . . . and other data showing the *particularized*
10           *insurance requirements and preferences* of the accounts.

11           . . . this Confidential Information constitutes a valuable property of [Gallagher] and
             its affiliates, developed over a long period of time and at substantial expense, and
12           acknowledges [Gallagher's] legitimate interest in safeguarding the Confidential
             Information from disclosure. Accordingly, the [employee] agrees that he will not,
13           at any time during his employment by [Gallagher] or thereafter, directly or
             indirectly, divulge such Confidential Information or make use of it *for his own*
14           *purposes or the purposes of another*.[88]

15       *Second*, Defendants emailed themselves highly confidential Gallagher and/or Gallagher

16   client information—such as lists of prospects, expiration reports, pricing information, commission

17   rates, etc.—that squarely fall within the definition of "Confidential Information" in the Defendants'

18   respective employment agreements with Gallagher.  A representative sample of these breaches of

19   the confidentiality provision includes[89]:

20       • Heater emailed herself a client expiration report before she left Gallagher, which
           included a detailed breakdown of every insurance policy a client has, the policy's
21         carrier, policy numbers, policy descriptions, premiums, and expiration dates.[90] Heater
           admits she kept this report after she left Gallagher and used it after she joined Alliant.[91]

22       • In May 2020—two months before he resigned from Gallagher—Tarantino sent himself:

23           o A compilation of information related to a Gallagher client (that ultimately
               switched from Gallagher to Alliant), including an email regarding underwriters'
24             written coverage determination, confidential policy details, confidential pricing

25   

26   [88] ECF No. 40-1 § 7(b) (Tarantino) (emphasis added); ECF No. 40-2 § 7(b) (Machette) (emphasis added);
     ECF No. 40-3 ¶ 5 (Heater) (emphasis added); ECF No. 40-4 § 2.B (similar to Brush).
27   [89] *See* Section II, *supra*, for further evidence of the Defendants' misappropriation. Moreover, on the eve of
     the close of fact discovery (on March 23, 2020), Defendants returned more than 19,000 of Gallagher's
28   documents in their possession since they resigned in July 2020 to Gallagher.
     [90] Binford Decl. ¶ 8 & Exs. 67–68.
     [91] McMeel Decl. ¶ 7 & Ex. 6 (Heater Dep.) at 121:17–21, 122:14–25.

information, property locations subject to coverage, etc.[92]

- o A compilation of information related to another Gallagher client (that ultimately switched from Gallagher to Alliant), including confidential coverage information, premium prices, etc.[93]

- In July 2020—about three weeks before Machette and Brush resigned from Gallagher—Machette sent to Brush's personal email address a spreadsheet containing hundreds of thousands of items of highly sensitive data related to Gallagher's clients, including identities of insured parent companies; policy numbers; policy effective dates; expiration dates; revenues; etc.[94]

- In July 2020, Brush took confidential Gallagher client information, at Machette's behest:

- o Brush texted Machette: "Ok I'm getting all info on your book policy numbers etc. . ."[95]

- o Machette responded: "I have a list of clients, who can get their email, policy and tel numbers – maybe take iPhone picture off computer??"[96]

*Lastly*, Defendants' argument that there can be no breach because some of the information that Defendants emailed themselves contained client-related information, is unavailing.  Defendants appear to be conflating the legal definition of a "trade secret"—which pertains to Gallagher's trade secret misappropriation claim, not its breach of contract claim—with "Confidential Information" as defined in the Defendants' employment agreements.  It is undisputed that the definition of "Confidential Information" includes client-related information (*e.g.*, identities of key contacts at Gallagher accounts; policy renewal information; etc.).  Because Defendants breached their respective confidentiality provisions by emailing themselves Confidential Information before their mass departures from Gallagher, partial summary judgment on Gallagher's contract claim should be denied.  *See, e.g.*, *Silicon Image, Inc. v. Analogix Semi.*, 642 F. Supp. 2d 957, 965 (N.D. Cal. 2008); *GSI Tech., Inc. v. United Memories Inc.*, 2015 WL 5655092, at *16 (N.D. Cal. Sept. 25, 2015).

## V.   GALLAGHER'S NON-TRADE SECRET CLAIMS ARE NOT PREEMPTED BECAUSE THEY INVOLVE FACTS DISTINCT FROM ITS TRADE SECRET CLAIMS

This Court has already largely addressed the preemption issues in ruling on Defendants' motion to dismiss Gallagher's FAC.  (MTD Order at 23.)  This Court held that Gallagher's claims

---

[92] McMeel Decl. ¶ 29 & Ex. 28.
[93] *Id.* ¶ 30 & Ex. 29.
[94] *Id.* ¶ 23 & Ex. 22.
[95] *Id.* ¶ 24 & Ex. 23.
[96] *Id.* ¶ 25 & Ex. 24.

1    "based on conduct that does not implicate trade secret misappropriation" are not preempted by the

2    CUTSA.[97]  (*Id.* (Gallagher's tort claims that are based on allegations of misconduct "independent of

3    any trade secrets" are not subject to preemption) (citing *Henry Shein, Inc. v. Cook*, 2017 WL

4    783617, at *2 (N.D. Cal. Mar. 1, 2017)).)

5          As set forth in *Henry Shein*, the "preemption inquiry is a factual one, focusing on whether

6    other claims are no more than a restatement of the same operative facts supporting trade secret

7    misappropriation."  *Henry Shein*, 2017 WL 783617, at *2 (internal quotations and citation omitted)

8    (no preemption where tort claim did not merely restate same facts as CUTSA claim); *see also*

9    *Zomm, LLC v. Apple Inc.*, 391 F. Supp. 3d 946, 954 (N.D. Cal. 2019) (Where a claim "arises from

10   misconduct besides misappropriation, it can survive CUTSA [preemption].").

11         Defendants have made no attempt to demonstrate the absence of a genuine issue of material

12   fact with respect to any of the non-trade secret claims that are the object of their Motion.  Instead,

13   Defendants simply attack the allegations in the SAC in support of their  preemption argument.  For

14   this reason alone, their Motion must be denied.  *See Alcalde v. NAC Real Estate Inv.*, WL 9712047,

15   at *2 n.2 (C.D. Cal. Jan. 5, 2007) ("the party against whom the motion [for summary judgment] is

16   directed is entitled to a denial of the motion . . . where the movant's papers are insufficient on their

17   face or themselves demonstrate the existence of a material issue of fact.") (internal quotations

18   omitted).

19          But even if Defendants had shifted the burden to Gallagher, there are genuine issues of

20   material fact with respect to each of the Fourth, Fifth, and Sixth Causes of Action that entitle

21   Gallagher to have these claims decided by the jury.  For the reasons set forth below, and following

22   this Court's prior analysis, Gallagher's Fourth (breach of fiduciary duty), Fifth (intentional

23   interference with prospective economic relations), and Sixth (unfair competition under Cal. Bus.

---

[97] This Court further held that some of Gallagher's claims were "predicated **in part** on trade secret misappropriation" and "[t]o that extent, there [was] preemption."  (MTD Order at 23 (emphasis in original).) However, the Court recognized that Gallagher's claims were "also based on conduct that does not implicate trade secret misappropriation."  (*Id.*)  For example, Gallagher's breach of fiduciary duty claim "alleged misconduct on the part of Mr. Tarantino and Mr. Machette **independent of any trade secrets**," so "[t]o that extent, there can be no basis for CUTSA preemption."  (*Id.* (emphasis added).)  The Court further clarified that there was only "**partial** CUTSA preemption – *i.e.*, to the extent [Gallagher's] claims are predicated on trade secret misappropriation, **but not otherwise**."  (*Id.* at 27 (emphasis added).)

Prof. Code § 17200, et seq.) Causes of Action are not preempted by the CUTSA, and Defendants'

Motion on this ground should be denied.

### A.   Gallagher's Breach of Fiduciary Duty Claim Is Not Preempted by the CUTSA

Preemption is not warranted because Gallagher's breach of fiduciary duty claim is based on

materially distinct facts from its trade secrets claims.[98]  Specifically, Gallagher alleges:

- "Tarantino and Machette owed Gallagher fiduciary duties, including the duty of loyalty," which were breached "by, among other things, soliciting customers and employees from Gallagher while they were still employed at Gallagher."  (SAC ¶¶ 81-82.)

- "Tarantino, while still employed by Gallagher, hosted golfing outings, dined with, and solicited Gallagher's clients to move their business to Alliant, at Gallagher's expense, within the weeks prior to his resignation from Gallagher."  (SAC ¶ 26.)

- "[O]n or about June 19-20, 2020, Tarantino took at least two of Gallagher's long-time clients to golf and dinner . . . to solicit their business for Tarantino at Alliant. Tarantino charged these outings to Gallagher."  (SAC ¶ 27.)

- In "violation of his duty of care and loyalty Tarantino owed to Gallagher, and in violation of the Tarantino Agreement, Tarantino had told Alliant, during his Alliant recruitment, that these same accounts would leave Gallagher and follow him to Alliant."  (SAC ¶ 31.)

- Additionally, "while still employed as a high-level manager at Gallagher, Machette was advising Alliant that he would solicit his current Gallagher clients to leave Gallagher in favor of his new employer, in violation of his employment agreement and his fiduciary duties."  (SAC ¶ 34.)

- Moreover, "in violation of his duty of loyalty and his employment agreement, while employed with Gallagher, Machette was soliciting Gallagher employees, including Brush, to move with him" as well as "actively reach[ing] out to his clients to solicit their business for Alliant."  (SAC ¶ 34.)[99]

In other words, Gallagher alleges that Tarantino and Machette breached their fiduciary

duties, regardless of whether they used any trade secrets to do so.  *See, e.g.*, *Hiossen, Inc. v. Kim*,

2016 WL 10987365, at *16 (C.D. Cal. Aug. 17, 2016) (no preemption because breach of fiduciary

duty claim was premised on the defendant's transfer of loyalty to a competitor before resigning);

---

[98] Defendants' selective recitation of certain misappropriation allegations—and their representation that those are the ***only*** supporting allegations for Gallagher's non-trade secrets claims—is misleading. Defendants have conveniently omitted the non-misappropriation allegations that are also incorporated into Gallagher's non-trade secrets claims.

[99] Defendants' attempt to confuse the pleadings should also be disregarded.  In support of their preemption argument for the breach of fiduciary duty claim, Defendants cite to paragraphs 61 and 73 of the SAC.  (Mot. at 11.)  However, a closer reading reveals that those paragraphs pertain to Gallagher's trade secret claims. *See* SAC ¶ 61 ("Defendants' misappropriation of Gallagher's trade secrets has caused millions of dollars in harm through the loss of clients . . . .); ¶ 73 (same; alleged under Third Cause of Action for Trade Secret Misappropriation).

1  *ChromaDex, Inc. v. Elysium Health, Inc.*, 369 F. Supp. 3d 983, 990 (C.D. Cal. 2019) (no

2  preemption where breach of fiduciary duty claim was premised on the former employee helping the

3  plaintiff's competitor recruit plaintiff's employees, at the plaintiff's expense, which was "broader

4  and different from the taking of confidential information.").

5      Defendants have not demonstrated that these allegations are unsupported by evidence

6  sufficient to establish a genuine issue for jury determination.  Moreover, the evidence supports

7  Gallagher's breach of fiduciary duty claim against Machette and Tarantino. *See* Section I, *supra*.

8  *ATS Prods Inc. v. Ghiorso*, 2012 WL 253315, at *3 (N.D. Cal. Jan. 26, 2012) (denying motion for

9  judgment as a matter of law where facts independent of misappropriation claim supported breach of

10 fiduciary duty claim).[100]

11      In sum, because there are facts and evidence in support of Gallagher's breach of fiduciary

12 duty claim distinct from those in support of its trade secrets claims, and because Tarantino and

13 Machette's misconduct is independent of any trade secrets misappropriation (MTD Order at 23),

14 there is no preemption.  *See Henry Shein*, 2017 WL 783617, at *3 (no preemption where breach of

15 fiduciary duty claim did "not merely restate the same facts as the CUTSA claim" and were based on

16 "separate allegations" distinct from the CUTSA claim, including that the defendant "solicited

17 customers to move their business to [the competitor]"); *Zayo Grp v. Hisa*, 2013 WL 12201401, at *4

18 (C.D. Cal. Sept. 17, 2013) (no preemption where breach of fiduciary duty claim was based on

19 allegations of "improperly utilizing confidential information acquiring during the course of []

20 employment," in addition to other allegations, such as "soliciting business opportunities for

21 themselves and to the detriment of [plaintiff,]" which "extend[ed] beyond the nucleus of facts in the

22 trade secret claim"); *Robert Half Int'l, Inc. v. Ainsworth*, 68 F. Supp. 3d 1178, 1190 (S.D. Cal.

23 2014) (no preemption because breach of fiduciary duty claim was premised on the defendant

24 soliciting competitor's employees to work for a competitor in violation his fiduciary duties).

25      **B.    Gallagher's Intentional Interference Claim Is Not Preempted by the CUTSA**

26      Gallagher's intentional interference claim also survives preemption because the factual

---

[100] Defendants rely on *Nelson Bros.*, however, the plaintiff there could not demonstrate that there were facts supporting its non-trade secret claim that were independent from the trade secret misappropriation facts. 2017 WL 8220703 at *8.  Here, however, Gallagher has set forth facts that are materially distinct from those in support of its trade secret claims (*see supra*).

23

allegations and evidence in support of such claim is not solely based on Tarantino and Machette's use of confidential Gallagher information; it is also independently based on the allegations, including:

- "Tarantino and Machette intentionally interfered with Gallagher's [business] relationships by soliciting Gallagher's clients to cease their business with Gallagher and join them at Alliant."  (SAC ¶ 88.)

- "Tarantino and Machette engaged in wrongful conduct in doing so, by (among other things) breaching their employment agreements and breaching their fiduciary duties to Gallagher, all of which was outside the boundaries of fair competition."  (SAC ¶ 89.)

The evidence in support of Gallagher's fiduciary duty claim also forms the basis of its intentional interference claim.[101]  Because Gallagher's intentional interference claim is predicated on wrongful conduct independent of any trade secret misappropriation, there is no CUTSA preemption.  *See Henry Shein*, 2017 WL 783617, at *4 (no preemption where intentional interference claim was based on the defendant "solicit[ing] customers to move their business from [plaintiff's company] to [competitor], negotiated prices on behalf of competitor, and visited the offices of [plaintiff's] customers in an effort to introduce or encourage customers to switch to [competitor]."); *SMC Networks, Inc. v. Hitron Techs. Inc.*, 2013 WL 12114104, at *11 (C.D. Cal. Nov. 13, 2013) (no preemption where intentional interference claim was predicated on the defendant soliciting a plaintiff's customer to give its business to a competitor).[102]

**C.    Gallagher's Unfair Competition Claim Is Not Preempted by the CUTSA**

Gallagher's unfair competition claim also survives CUTSA preemption because it is based on non-theft related conduct (including breach of fiduciary duties), ***in addition to*** misappropriation of confidential information.  *See Henry Shein*, 2017 WL 783617, at *4 (no preemption where unfair competition claim contained allegations of trade secrets misappropriation, in addition to "several allegations" that "do not necessarily implicate [the defendant's] misappropriation of [the plaintiff's] trade secrets."). Specifically, Gallagher alleges:

- Defendants "engag[ed] in wrongful conduct including, but not limited to, unfairly and improperly inducing employees and customers to leave Gallagher in contravention of the

---

[101] *See* Section I, *supra*.

[102] Furthermore, the cases Defendants rely on in their Motion are not on point because the tort claims there were premised entirely on misappropriation of confidential information.  *See Nelson Bros.*, 2017 WL 8220703, at *7; *Robert Half*, 68 F. Supp. 3d at 1190-92; *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 81 (N.D. Cal. 2020).  Here, Gallagher's intentional interference claim is premised on misconduct beyond misappropriation of confidential or proprietary information; therefore, preemption is not warranted.

24

employment agreements Defendants knew were in place, breaches of Tarantino's and Machette's fiduciary duties to Gallagher, and for their interference with Gallagher's client relationships."  (SAC ¶ 93.)

- As a result, "Gallagher has incurred costs in interruptions of service to its clients, lost valued, customers, and is now forced to compete with a competitor using Gallagher's former fiduciaries using Gallagher's information."  (SAC ¶ 94.)

The evidence in support of Gallagher's fiduciary duty claim also forms the basis of its unfair competition claim.[103]  Accordingly, there is no preemption under the CUTSA.  *See Codexis, Inc. v. Enzymeworks, Inc.*, 2016 WL 4241909, at *7-8 (N.D. Cal. Aug. 11, 2016) (rejecting preemption argument because the unfair competition claim was based on facts "independent" of trade secrets misappropriation, such as "photographing [the plaintiff's] presentation during a conference in violation of the conference's rules," and "reverse engineering" the plaintiff's products in "violat[ion] of the terms and conditions" of the contracts under which the products were sold); *Copart, Inc.*, 277 F. Supp. 3d at 1160 (no preemption where unfair competition claim relied on factually distinct misconduct from trade secret misappropriation and because the defendant received benefits "as a result of its fraud, negligence, and other improper conduct.").

### D. Gallagher's Non-Trade Secret Claims Are Not Preempted Simply Because Preceding Allegations in the SAC Are Incorporated Therein

Defendants argue that because Gallagher's SAC incorporates by reference, in its non-trade secret claims, certain factual allegations that cover the trade secret misappropriation claim, the former are preempted by the CUTSA.  (Mot. at 10,12, 13.)[104]  That is not the law.[105]  Defendants' "incorporation" argument is simply insufficient to meet their "high burden" necessary to prevail on a motion for summary judgment.

### CONCLUSION

For these reasons, Defendants' Motion should be denied in its entirety.

---

[103] *See* Section I, *supra*.

[104] Defendants' reliance on *SunPower*, 2012 WL 6160472 and *Monolithic Power Sys., Inc. v. Dong*, 2021 WL 4522291 (N.D. Cal. June 22, 2021) is misplaced.  Those cases analyzed preemption squarely in the context of a motion to dismiss, and neither of them held that simply incorporating prior allegations into other claims provides an independent basis for preemption at the summary judgment stage.

[105] Courts have flatly rejected Defendants' argument. *See, e.g.*, *Henry Shein*, 2017 WL 783617, at *3 (though plaintiff "incorporate[ed] all prior allegations by reference within each cause of action," the court held that breach of fiduciary duty, tortious interference, and unfair competition claims were "not based on the same nucleus of facts as the CUTSA claim and therefore are not preempted"); *Kovesdy v. Kovedsy*, 2010 WL 3619826, at *3 (N.D. Cal. Sept. 13, 2010) (similar).

25

1    Dated: April 7, 2022                         By:   /s/ Meghan R. McMeel

2                                                 RILEY SAFER HOLMES & CANCILA LLP
                                                  Ronald S. Safer (admitted *pro hac vice*)
3                                                 Harnaik Kahlon (admitted *pro hac vice*)
                                                  Meghan R. McMeel (SBN 284841)
4                                                 456 Montgomery Street, 16th Floor
                                                  San Francisco, CA 94104
5                                                 Telephone:     415-275-8550
                                                  Facsimile:     415-275-8551
6                                                 rsafer@rshc-law.com
                                                  nkahlon@rshc-law.com
7                                                 mmcmeel@rshc-law.com

8                                                 HOLLAND & KNIGHT LLP
                                                  Sarah A. Marsey (SBN 297911)
9                                                 Alex Hadduck (SBN 312962)
                                                  50 California Street, Suite 2800
10                                                San Francisco, CA 94111
                                                  Telephone:   415-743-6900
11                                                Facsimile:   415-743-6910
                                                  sarah.marsey@hklaw.com
12                                                alex.hadduck@hklaw.com

13                                                Attorneys for Plaintiff
                                                  ARTHUR J. GALLAGHER & CO.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28